LEWIS ᴇᴛ ᴀʟ., TRUSTEES, *v.* BENEDICT
COAL CORP.

No. 18.   Argued October 21, 1959.—Decided February 23, 1960.*

---

*Together with No. 19, *United Mine Workers of America et al.* v.
*Benedict Coal Corp.*, also on certiorari to the same Court.

*Russell R. Kramer* argued the cause for petitioners in No. 18. With him on the brief were *Val J. Mitch, Harold H. Bacon, E. H. Rayson* and *Charles E. McNabb.*

*M. E. Boiarsky* argued the cause for petitioners in No. 19. With him on the brief were *Welly K. Hopkins, Harrison Combs* and *Willard P. Owens.*

*Robert T. Winston, Jr.* argued the causes for respondent. With him on the briefs was *Fred B. Greear.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The National Bituminous Coal Wage Agreement of 1950, a collective bargaining agreement between coal operators and the United Mine Workers of America, provides for a union welfare fund meeting the requirements of § 302 (c)(5) of the Taft-Hartley Act.[1] The

---

[1] Section 302 (c)(5) is as follows:

"The provisions of this section [making it unlawful for the employer to deliver and a representative of the employees to receive anything of value] shall not be applicable . . . with respect to money or other thing of value paid to a trust fund established by such representative,

fund is the "United Mine Workers of America Welfare and Retirement Fund of 1950." Each signatory coal operator agreed to pay into the fund a royalty of 30¢, later increased to 40¢, for each ton of coal produced for use or for sale.

Benedict Coal Corporation, the respondent in both No. 18 and No. 19, is a signatory coal operator. From

for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement ,or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities." Act of June 23, 1947, § 302, 61 Stat. 157, 29 U. S. C. § 186 (c) (5).

March 5, 1950, through July 1953, Benedict produced coal upon which the amount of royalty was calculated to be $177,762.92. Benedict paid $101,258.68 of this amount but withheld $76,504.24. The petitioners in No. 18, who are the trustees of the fund, brought this action to recover that balance in the District Court for the Eastern District of Tennessee.[2] Benedict's main defense was that the performance of the duty to pay royalty to the trustees, regarding them as third-party beneficiaries of the collective bargaining agreement, was excused when the promisee contracting party, the union and its District 28—who are the petitioners in No. 19 and who will be referred to as the union—violated the agreement by strikes and stoppages of work. Benedict also cross-claimed against the union for damages sustained from the strikes and stoppages. By its answer to the cross-claim, the union denied that its conduct violated the agreement.

The jury, using a verdict form provided by the trial judge, found that the trustees were entitled to recover the full amount of the unpaid royalty but that Benedict was entitled to a setoff of $81,017.68; the jury also gave a verdict to Benedict for that sum on its cross-claim against the union. In a single entry, two judgments were entered on this verdict. One was a judgment in favor of Benedict on its cross-claim on which immediate execution was ordered, but with direction that the sum collected from the union be paid into the registry of the court. The other was a judgment in favor of the trustees for the unpaid balance of the royalty. However, effect was given to Benedict's defense in the trustees' suit by refusing immediate execution, and interest, on the trustees' judgment and ordering instead that that judgment be

---

[2] The article creating the fund provides that "Title to all the moneys paid into and or due and owing said Fund shall be vested in and remain exclusively in the Trustees of the Fund . . . ."

satisfied only out of the proceeds collected by Benedict on its judgment and paid into the registry of the court.[3]

The union and the trustees prosecuted separate appeals to the Court of Appeals for the Sixth Circuit. The union alleged that the District Court erred in holding that the strikes and stoppages violated the collective bargaining agreement, contending that, properly construed, the agreement did not forbid the strikes and stoppages; in the alternative, the union urged that the damages awarded were excessive. The trustees alleged as error, primarily, the refusal of the trial court to allow them immediate and unconditional execution, and interest, on their judgment against Benedict.

The Court of Appeals affirmed the District Court except as to the amount of damages awarded to Benedict

---

[3] The District Court's entry reads in pertinent part as follows:

"Thereupon this action came on to be heard on a former day before the Court and a verdict was rendered by the jury in favor of Benedict Coal Corporation in the sum of $81,017.68 and in favor of John L. Lewis, Charles A. Owen and Josephine Roche [trustees of the fund] in the sum of $76,504.26, the verdict containing an offset provision.

"In accordance with the Court's interpretation of the offset provision in the jury's verdict and as a means of carrying out the intended effect of the verdict, it is ordered that the Benedict Coal Corporation have and recover the sum of $81,017.68 from United Mine Workers of America and United Mine Workers of America District 28, for which execution may issue.

"It is further ordered that said sum of $81,017.68 be paid into the registry of the Court to be disbursed by the clerk in accordance with instructions appearing below.

"It is further ordered that said Trustees, in accordance with the verdict rendered in their favor, have and recover of Benedict Coal Corporation the sum of $76,504.26, said recovery to be had in the manner following: From the aforesaid $81,017.68 ordered paid into the registry of the Court, that the sum of $76,504.26 be paid to said Trustees. That the difference between $76,504.26 and $81,017.68 be paid to Benedict Coal Corporation."

on its cross-claim, which the court adjudged was excessive. The court held that, under the evidence, Benedict's damages would not equal the amount of the trustees' judgment of $76,504.26. The case was remanded for a redetermination of Benedict's damages, with instructions that "[t]he judgment in favor of the Trustees will then be amended by the district court to allow execution and interest on that part of the said judgment which is in excess of the set-off in favor of Benedict as so redetermined." 259 F. 2d 346, 355. This left unaffected so much of the District Court's order as predicated the trustees' recovery, to the extent of the amount of Benedict's judgment as finally determined, upon Benedict's recovery of that judgment. The trustees and the union filed separate petitions for certiorari. We granted the trustees' petition, No. 18, and also the union's petition, No. 19, except that we limited the latter grant to the question whether the strikes and stoppages complained of by Benedict violated the collective bargaining agreement. 359 U. S. 905.

In No. 19, the Court is equally divided. The judgment of the Court of Appeals, so far as it sustains the holding of the District Court that the union violated the collective bargaining agreement, is therefore affirmed.

We turn to the question presented in No. 18, whether the lower courts were correct in holding in effect that Benedict might assert the union's breaches as a defense to the trustees' suit, for to the extent Benedict (the promisor) does not collect from the union (the promisee) the union's liability is set off against Benedict's liability to the third-party beneficiary. The answer to that question requires, we think, our consideration of the nature of the interests of the union, the company, and the trustees in the fund under the collective bargaining agreement.

The provisions of the collective bargaining agreement creating the fund include the express provision that "this

Fund is an irrevocable trust created pursuant to Section 302 (c) of the 'Labor-Management Relations Act, 1947.' " Another provision specifies that the purposes of the fund shall be all purposes "provided for or permitted in Section 302 (c)." [4] In this way the agreement plainly declares what the statute requires, namely, that the fund shall be used "for the sole and exclusive benefit" of the employees, their families and dependents. Thus, the fund is in no way an asset or property of the union.

Benedict does not, however, base its claim of setoff on any contention that the royalty was owing to the union and might because of this be applied to the payment of its damages. Benedict's position is that in an amount equal to the amount of the damages sustained from the union's breaches, no fund property came into existence under the terms of the collective bargaining agreement. This depends upon whether the agreement is to be construed as making performance by the union of its promises a condition precedent to Benedict's promise to pay royalty to the trustees. Benedict argues that the contracting parties expressed this meaning in an article at the close of the agreement—"This Agreement is an integrated instrument and its respective provisions are interdependent"—and in the provision in another article that the no-strike clauses are "part of the consideration of this contract." However, the specific provisions of the article creating the fund provide: (1) "During the life of this [collective bargaining] Agreement, there shall be paid into such Fund by each operator signatory . . . [a royalty] on each ton of coal *produced for use or for sale.*" (2) The operator is required to make payment "on the 10th day of each . . . calendar month covering *the production of all coal for use or sale* during the preceding month." (3) "This obligation of each Operator signatory

---

[4] See note 1, *supra*.

466

hereto, which is several and not joint, to so pay such sums shall be a *direct and continuing obligation* of said Operator during the life of this Agreement . . . ." (4) "Title to all the moneys paid into and or *due and owing* said Fund shall be vested in and remain exclusively in the Trustees of the Fund . . . ."[5] (Emphasis added.) These provisions, rather than the stipulations of general application, are controlling. Their clear import is that the parties meant that the duty to pay royalty should arise on the production of coal independent of the union's performance. Indeed, Benedict's conduct was not consistent with the interpretation which it is now urging. Benedict continued despite the breaches to perform all of its several promises under the contract, including the promise to pay royalty, paying over $100,000 on coal produced during the period in dispute and withholding only the portion in suit.

But our conclusion that the union's performance of its promises is not a condition precedent to Benedict's duty to pay royalty does not fully answer the question we are to decide. For it may reasonably be argued that the damages sustained by Benedict may nevertheless affect the *amount* of the trustees' recovery. Professor Corbin, while acknowledging that "No case of the sort has been discovered,"[6] states: "It may perhaps, be regarded as just to make the right of the beneficiary not only subject to the conditions precedent but also subject (as in the case of an assignee) to counter-claims against the promisee— at least if they arise out of a breach by the promisee of

---

[5] In an earlier agreement the last clause read "moneys *paid into* said Fund" and was amended to read "moneys *paid into and or due and owing said Fund*".(emphasis added) after the decision in *Lewis* v. *Jackson & Squire, Inc.,* 86 F. Supp. 354, appeal dismissed, 181 F. 2d 1011, holding, among other things, that under the agreement, no trust arose as to royalty not paid into the fund.

[6] But cf. *Fulmer* v. *Goldfarb,* 171 Tenn. 218, 101 S. W. 2d 1108; *Depuy* v. *Loomis,* 74 Pa. Super. 497.

his duties created by the very same contract on which the beneficiary sues." [7] Using terms like "counterclaim" or "setoff" in a third-party beneficiary context may be confusing. In a two-party contract situation, when a promisor's duty to perform is absolute, the promisee's breaches will not excuse performance of that duty; the promisor has an independent claim against the promisee in damages. Formerly the promisor was required to bring a separate action to recover his damages. Under modern practice, when the promises are to pay money, or are reducible to a money amount, the promisor, when sued by the promisee, offsets the damages which he has sustained against the amount he owes, and usually obtains a judgment for any excess.[8]

However, a third-party beneficiary has made no promises and therefore has breached no duty to the promisor. Accordingly, to hold, as the lower courts in this case did, that a promisor may "set off" the damages caused by the promisee's breach is actually to read the contract, which is the measure of the third party's rights, as so providing. In other words, although the promisor's duty to perform has become fixed by the occurrence of applicable conditions precedent, the parties may be taken to have agreed that the *extent* of the promisor's duty to the third party will be affected by the promisee's breach of contract. When it is said that "it may be just" to make the third party subject to the counterclaim, what must be meant is that a court should infer an intention of the promisor and promisee that the third party's rights be so limited.

This may be a desirable rule of construction to apply to a third-party beneficiary contract where the promisor's interest in or connection with the third party, in

[7] 4 Corbin, Contracts, § 819.

[8] See 3 Corbin, Contracts, § 709. Cf. 3 Williston, Contracts, § 883 (Rev. ed. 1936). Compare *Thornton* v. *Wynn,* 12 Wheat. 183, with *Withers* v. *Greene,* 9 How. 213.

contrast with the promisee's, begins with the promise and ends with its performance. Of course, in entering into such a contract, the promisor may be held to have given up some defense against the third party's claim to performance of the promise, for example, the right to defeat that claim by rescinding the contract at any time he and the promisee agree. Nevertheless it may be fair to assume that had the parties anticipated the possibility of a breach by the promisee they would have provided that the promisor might protect himself by such means as would be available against the promisee under a two-party contract.[9] This suggestion has not been crystallized into a rule of construction. Our problem is whether we should infer such an intention in this contract because there may be reasons making it appropriate to do so in the generality of third-party beneficiary contracts.

This collective bargaining agreement, however, is not a typical third-party beneficiary contract. The promisor's interest in the third party here goes far beyond the mere performance of its promise to that third party, i. e., beyond the payment of royalty. It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death. While employers in many other industries assume this burden directly, this welfare fund was jointly created by the coal industry and the union for that purpose. Not only has Benedict entered into a long-term relationship with the union in this regard, but in compliance with § 302 (c)(5)(B) it has assumed equal responsibility with the union for the management of the fund. In a very real sense Benedict's interest in the soundness of the fund and its management is in no way

---

[9] To some degree the third-party beneficiary may be thought of as being "substituted" for the promisee. See *Dunning* v. *Leavitt*, 85 N. Y. 30, 35.

less than that of the promisee union. This of itself cautions against reliance upon language which does not explicitly provide that the parties contracted to protect Benedict by allowing the company to set off its damages against its royalty obligation.

Moreover, unlike the usual third-party beneficiary contract, this is an industry-wide agreement involving many promisors. If Benedict and other coal operators having damage claims against the union for its breaches may curtail royalty payments, the burden will fall in the first instance upon the employees and their families across the country. Ultimately this might result in pressures upon the other coal operators to increase their royalty payments to maintain the planned schedule of benefits. The application of the suggested rule of construction to this contract would require us to assume that the other coal operators who are parties to the agreement were willing to risk the threat of diminution of the fund in order to protect those of their number who might have become involved in local labor difficulties.

Furthermore, Benedict promised in the collective bargaining agreement to pay a specified scale of wages to the employees. It would not be contended that Benedict might recoup its damages by decreasing these wages. This could be rationalized by saying that the covenant to pay wages is included in separate contracts of hire entered into with each employee. The royalty payments are really another form of compensation to the employees,[10] and as such the obligation to pay royalty might be thought to be incorporated into the individual employment contracts. This is not to say that the same treatment should necessarily be accorded to royalty payments as is accorded to wages, but the similarity militates against the inference

[10] See 93 Cong. Rec. 4746–4747. See also S. Rep. No. 105, 80th Cong., 1st Sess. 52 (supplemental views).

that the parties intended that the trustees' claim be subject to offset.

Finally a consideration which is not present in the case of other third-party beneficiary contracts is the impact of the national labor policy. Section 301 (b) of the Taft-Hartley Act provides that "[a]ny money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." At the least, this evidences a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it.[11] Although this policy was prompted by a solicitude for the union members, because they might have little opportunity to prevent the union from committing actionable wrongs,[12] it seems to us to apply with even greater force to protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs. Thus the national labor policy becomes an important consideration in determining whether the same inferences which might be drawn as to other third-party agreements should be drawn here.

Section 301 authorizes federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements. *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448. In the discharge of this function, having appropriate regard for the several considerations we have discussed, including the national labor policy, we hold that the parties to a collective bar-

---

[11] See 93 Cong. Rec. 5014; *id.*, at 3839. Cf. Hearings before House Committee on Education and Labor on H. R. 8, H. R. 725, H. R. 880, H. R. 1095, and H. R. 1096, 80th Cong., 1st Sess. 135–136.

[12] See 93 Cong. Rec. 6283.

gaining agreement must express their meaning in unequivocal words before they can be said to have agreed that the union's breaches of its promises should give rise to a defense against the duty assumed by an employer to contribute to a welfare fund meeting the requirements of § 302 (c)(5). We are unable to find such words in the general provisions already mentioned—"This Agreement is an integrated instrument and its respective provisions are interdependent," and "The contracting parties agree that [the no-strike clauses are] . . . part of the consideration of this contract"—or elsewhere in the agreement. The judgment of the Court of Appeals is therefore modified to provide that the District Court shall amend the judgment in favor of the trustees to allow immediate and unconditional execution, and interest, on the full amount of the trustees' judgment for $76,504.26 against Benedict.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

This litigation arose out of an agreement entered into on March 5, 1950, between coal operators, including respondent, and United Mine Workers. It was the outcome of collective bargaining between the parties to fix the terms of industrial relations, wages and other conditions of employment, between the coal operators and their employees as represented by the union. It is an elaborate document of twenty pages, formulating the rights and obligations of the union on the one side and the rights and obligations of the operators on the other. Part of the agreement called for the establishment of a welfare and retirement fund for the benefit of employees and their families. This obligated the respondent, as one

of the operators bound by the agreement, to pay the Fund a fixed amount per ton of coal that it produced during the period in controversy. The narrow question before the Court is whether the respondent operator may withhold from the amount it is obligated, as a matter of arithmetic, to pay into the Fund, the amount of assessable damage owing it from the union in discharge of the union's liability for violation of its obligation under the agreement.

The suit was by the Trustees of the Fund, who claimed the payment in full of the scheduled amounts to be paid into the Fund. This liability is conceded, subject however to deduction for the amount owing from the union to Benedict on the basis of judicially determined liability. The Court of Appeals sustained the right of respondent to set off against its obligation to pay the defined amount into the Fund the amount arising out of liability by the union for breach of the union's obligation under the same agreement.

A considered reading of the Court's opinion compels the conclusion that if the agreement, which it is the Court's duty to construe, were "a typical third-party beneficiary contract" the respondent would not have to pay over the full amount payable to the Fund but could withhold the amount which is owing it for breach of the union's undertaking. The Court holds that this is not such a contract, although the agreement was not merely a single document with obviously interrelated sections, but specifically provided, "This agreement is an integrated instrument and its respective provisions are interdependent and shall be effective from and after March 5, 1950." The Court justifies rejecting what is assumed to be applicable to "a typical third-party beneficiary contract," partly by devising a policy distilled from two provisions of the Taft-Hartley Act, §§ 301 (b) and 302 (c) (5), and partly by its assumptions about the community of interest

between the employer and the trust fund in the assertedly special context of labor relations.

I have no doubt that legislation may be a source for reasoning in court-made law. But when legislation is thus drawn upon there should be a close relation between the terms of an enactment and what the courts deduce therefrom as a direction for adjudication. I find none such here. The two provisions drawn upon do not afford the radiations attributed to them. The relevant language of § 301 (b) of the Taft-Hartley Act provides that "Any money judgment against a labor organization . . . shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." The text deals expressly only with the enforcement of a money judgment rendered against a labor organization. No such judgment is involved in this case. The undoubted concern of Congress behind this provision was to avoid the liability of union members solely by virtue of their union membership, a liability notoriously imposed by the laws of several of the States in 1947 and vividly remembered by labor unions by reason of the *Danbury Hatters'* case in federal courts. See *Loewe* v. *Lawlor,* 208 U. S. 274 (1908); *Lawlor* v. *Loewe,* 235 U. S. 522 (1915); *Loewe* v. *Savings Bank of Danbury,* 236 F. 444 (C. A. 2d Cir. 1916).* The intent and scope of §.301 (b) were accurately described in the Senate Report on what became the Taft-Hartley Act as affording members of a union "all the advantages of limited liability without incorporation of the union." S. Rep. No. 105, 80th Cong., 1st Sess., at 16.

---

*The result of this litigation was a judgment for $250,000 against the goods and estate of over 150 named defendants and attachment was issued against them.

Nor does any emanation from § 302 (c)(5) of the Taft-Hartley Act negate what would otherwise dictate the right of setoff—setoff, be it remembered, not a condition on Benedict's duty to pay into the Fund—of what is owing to Benedict for breach of the contract by the union under the same contract by which Benedict promised the union to pay into the Fund for its mined coal. The function of § 302 (c)(5) is to define the conditions set by Congress for permitted industrial welfare funds. It was not an implied qualification of just principles relevant to the enforcement of contracts generally. Only the other day the Court stated the purpose of the Congress in enacting § 302 (c)(5):

"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. See 92 Cong. Rec. 4892–4894, 4899, 5181, 5345–5346; S. Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong. Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established." *Arroyo* v. *United States,* 359 U. S. 419, 426.

Congress was concerned with abuses by union officers, *e. g.,* *United States* v. *Ryan,* 350 U. S. 299. It gave not a thought to withdrawing the enforcement of an agreement such as the one before us from rules relevant to the fair administration of justice.

The Court quotes one of the twin leading authorities on the law of contracts: "It may perhaps, be regarded as

just to make the right of the beneficiary not only subject to the conditions precedent but also subject (as in the case of an assignee) to counter-claims against the promisee—at least if they arise out of a breach by the promisee of his duties created by the very same contract on which the beneficiary sues." 4 Corbin, Contracts, § 819. As I understand it, apart from the effects attributed to §§ 301(b) and 302 (c)(5), the Court rejects this "just" view as simply not applicable to this kind of a collective bargaining agreement. But the rule stated by Professor Corbin is not a technical rule narrowly limited to particular kinds of contracts. It reflects the broader generalization that under a civilized system of law all just presuppositions of an agreement are to be deemed part of it, and that courts, whose duty it is to determine the legal consequences of agreements, should attribute to an agreement such just presuppositions.

Underlying the Court's view is the assumption that the law of contracts is a rigorously closed system applicable to a limited class of arrangements between parties acting at arm's length, and that collective bargaining agreements are a very special class of voluntary agreements to which the general law pertaining to the construction and enforcement of contracts is not relevant. As a matter of fact, the governing rules pertaining to contracts recognize the diversity of situations in relation to which contracts are made and duly allow for these variant factors in construing and enforcing contracts. And so, of course, in construing agreements for the reciprocal rights and obligations of employers and employees, account must be taken of the many implications relevant to construing a document that governs industrial relations. There is no reason for jettisoning principles of fairness and justice that are as relevant to the law's attitude in the enforce-

ment of collective bargaining agreements as they are to contracts dealing with other affairs, even giving due regard to the circumstances of industrial life and to the libretto that this furnishes in construing collective bargaining agreements.

One of the most experienced students of labor law has warned against the dangers of such an approach:

> "The ease with which one can show that collective bargaining agreements have characteristics which preclude the application of some of the familiar principles of contracts and agency creates the danger that those who are knowledgeable about collective bargaining will demand that we discard all the precepts of contract law and create a new law of collective bargaining agreements. I have already expressed the view that the courts would ignore the plea but surely it is unwise even if they would sustain it. Many legal rules have hardened into conceptual doctrines which lawyers invoke with little thought for the underlying reasons, but the doctrines themselves represent an accumulation of tested wisdom, they are bottomed upon notions of fairness and sound public policy, and it would be a foolish waste to climb the ladder all over again just because the suggested principles were developed in other contexts and some of them are demonstrably inapposite. . . ." Cox, The Legal Nature of Collective Bargaining Agreements, in Collective Bargaining and the Law (Univ. of Mich. Law School), pp. 121–122.

Judges will do well to heed this admonition. Their experience makes them much more sure-footed in applying principles pertinent to the enforcement of contracts than they are likely to be in discerning the needs of wise industrial relations.

I would affirm the judgment.