290 F.2d 677
 Betty W. HENDERSON, Administratrix of the Estate of Joseph Arthur Henderson, Earle F. Henderson, and Maston Mullins, Appellants,
v.
EASTERN GAS AND FUEL ASSOCIATES, a Massachusetts Corporation, of Boston, Massachusetts, Appellee.
 No. 8249.
 United States Court of Appeals Fourth Circuit.
 Argued January 16, 1961.
 Decided May 13, 1961.
 
 Joseph C. Shaffer, Jr., Princeton, W. Va. (William S. Winfrey and Edward C. Freeman, Princeton, W. Va., on the brief), for appellants.
 L. R. Coulling, Jr., Bluefield, W. Va. (George Richardson, Jr., Bluefield, W. Va., on the brief), for appellee.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 Joseph Arthur Henderson, for whom the administratrix of his estate is here substituted, Earle F. Henderson and Maston Mullins, hereinafter sometimes referred to as the employees, appeal from a judgment of the District Court for the Southern District of West Virginia denying their claim for back wages allegedly due and granting a motion for summary judgment in favor of their former employer, the defendant, Eastern Gas and Fuel Associates.[1] The District Court held that exhaustion of arbitration procedures provided in the National Bituminous Coal Wage Contract, the collective bargaining contract covering the employees, hereinafter referred to as the Agreement, was a binding condition precedent to the institution of this litigation and that, having failed to exhaust that remedy, the employees were barred from maintaining this action. We are of the opinion that this judgment should be affirmed.
 
 
 2
 Eastern Gas and Fuel Associates, hereinafter referred to as the Company, is a Massachusetts corporation engaged in coal mining operations in the State of West Virginia. On May 29, 1946, the Company became a signatory to the Agreement, dated April 1, 1945, entered into by the Secretary of the Interior, as Coal Mines Administrator, and the United Mine Workers of America, which will be referred to as the Union, covering the terms and conditions of employment of union members. For several years prior to 1946, employees Joseph Arthur Henderson and Maston Mullins had worked for the Company as nonunion members. On May 29, 1946, they became union members and continued as such throughout their employment. On January 23, 1950, Earle F. Henderson joined the Union and began working for the Company in the same position and capacity as the two other employees above named.
 
 
 3
 It was the duty of each of these employees to observe the operation of an outside ventilating fan at the mine, to report to the mine office any failure of electric power and to manually operate the fan until power was restored. These employees allege that in performing this work, during a portion of their employment, they received a wage rate lower than that provided in the Agreement. Although the Agreement contained an extensive listing of job classifications and detailed rates of pay therefor, there has obviously been some question whether it included a classification specifically applicable to the type of services being performed by these employees.
 
 
 4
 The Agreement of 1950, which was in effect in April of 1951, provided rates of pay for "substation operators" and exactly the same rate for "all common able-bodied outside labor." The Agreement of 1952, which was in effect in May of 1956, specified a rate for "substation operators" and exactly the same rate for "all other labor not classified." These employees contend that they should have been classified as "substation operators" or, in the event they were not so classified, they should have been paid at the rate provided for the more general classification.[2]
 
 
 5
 Pertinent provisions of the Agreement as amended and in effect in 1950 are shown below.[3]
 
 
 6
 In April 1951 these employees, seeking to enforce their demands that they were, and had been, entitled to higher wages, filed grievances and pursued the grievance procedures through the second stage. Their claims were first considered by mine management and then by the Mine Committee and management. The Committee and management determined that the wage rate then being paid the employees was correct and proper under the terms of the Agreement. Earle F. Henderson voluntarily quit his employment with the Company in December of 1955 and did not reassert his claim until he engaged counsel to institute the present action in June 1958. In May 1956, Joseph Arthur Henderson and Maston Mullins again submitted a claim substantially the same as that presented in 1951. That claim was carried to the third stage of the prescribed grievance procedure, being considered (1) by the employees and mine management, (2) by the Mine Committee and management, and (3) by cisions. Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972; Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed. 2d 442; United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, a Union district representative and a Company commissioner. The third stage decision was in accord with the 1951 award, affirming the wage rates of these two employees as proper under the Agreement. These same two employees did not reassert their claim until they, together with Earle F. Henderson, instituted the present action and after they also had voluntarily quit their employment.
 
 
 7
 The District Court held that the employees were bound to exhaust their remedy provided in the Agreement's grievance and arbitration procedure and relied upon the West Virginia case of Pettus v. Olga Coal Co.[4] The facts in that case differ somewhat from the facts in the instant case. In Pettus the contract grievance procedures were pursued through the fourth stage without a decision and no further effort was made to submit the issue to an umpire as provided in the fifth and final stage. In the instant case it clearly appears that on two separate occasions the very claims here made were voluntarily submitted to those clothed by the Agreement with the authority to make a decision, and each submission resulted in a definite decision at one of the prescribed stages of the grievance procedure.
 
 
 8
 The Agreement was negotiated and signed by the Union "on behalf of each member thereof." These employees were union members and, in initiating grievances and following prescribed procedures, they were seeking to obtain certain wage benefits claimed to be due them by the terms of the Agreement. The plaintiffs do not here directly challenge the applicability or validity of the grievance procedures through which the decisions against them were made; nor do they appear to question the authority of those specified in the Agreement to act upon grievances. They seek only a judicial redetermination of the merits of their claims of entitlement to wage rates above those previously found as applicable to them. They seek to obtain alleged contractual benefits but at the same time they would ignore or disavow other provisions of the Agreement which appear to operate to their disadvantage.
 
 
 9
 The grievance procedure or arbitration clause broadly encompasses "any and all disputes" and "any and all claims" arising under the Agreement. In the absence of clear terms specifically excluding the claims, it must be said that they were a proper subject for determination by arbitration. United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. Furthermore, by their own conduct in following the grievance procedure, the employees disclosed their interpretation of the arbitration clause as inclusive of their claims, a factor which is of persuasive significance in determining that arbitration was the proper means of settlement of the issue.
 
 
 10
 Where the collective bargaining agreement provides a grievance procedure leading to arbitration, individual employees must look to that procedure and are bound by it just as are unions and employers. They cannot bypass the method prescribed in the contract for obtaining relief, either by failing to exhaust the grievance procedure or by ignoring the determination reached by such procedure if they have exhausted it, and litigate the merits of their claims in court. This conclusion would seem to be required as a matter of substantive labor law by several recent Supreme Court de 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. It is the logical result of the rule that courts do not review the merits of a labor arbitration award.[5]
 
 
 11
 However, we need not make this determination in the present case. Even should the plaintiffs' contention be correct that theirs is simply a contract suit for back wages, based upon diversity of citizenship, with West Virginia law controlling, they would not be entitled to relief.[6] The plaintiffs, both in the District Court and in this court, have frankly admitted that they have not exhausted the grievance procedure under the Agreement. Indeed, they assert that they need not exhaust it as a condition precedent to bringing this suit. Moreover, the record sustains their view that they have failed to exhaust the contractual remedies. Although in the earlier grievance proceedings there were decisions at particular stages adverse to these employees, and the union and the company apparently acquiesced in those decisions, the affidavits of the employees submitted to the District Court fail to indicate that they made an effort through any means which might have been available to them to press their grievance farther through the final steps of the grievance procedure. Such a showing would be necessary before the remedies provided in the collective bargaining contract could be deemed exhausted.
 
 
 12
 The plaintiffs, however, argue that under state law where the suit is merely for back wages there need be no exhaustion of these "administrative" remedies. They rely upon language from one of the opinions in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 460, 75 S.Ct. 489, 500, 99 L.Ed. 510, involving a wage controversy, that: "The employees have always been able to enforce their individual rights in the state courts." That case, however, did not deal with a collective bargaining agreement with a grievance procedure leading to arbitration for the settlement of such controversies. Moreover, the Supreme Court of Appeals of West Virginia, dealing with the same contract that is now before us and with a dispute over wages, held that the language of this Agreement "precludes any right of action or suit until after the procedure provided by the contract for arbitration has been followed through." Pettus v. Olga Coal Co., supra [137 W.Va. 492, 72 S.E.2d 886].
 
 
 13
 The District Court and both parties in this court took the view that the grievance procedure provided in the Agreement had not been exhausted. The record does not clearly demonstrate that this view is erroneous. Whatever would be the plaintiffs' remedy, if any, had there been an exhaustion of the grievance procedure, it is clear that, absent such exhaustion, they cannot mantain the present action.
 
 
 14
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Though originally tendered in the form of a motion to dismiss, defendant's motion was, at the court's suggestion, treated as one for summary judgment upon the filing of affidavits in support thereof. The employees also filed a motion for summary judgment which was denied
 
 
 [2]
 At the time these employees voluntarily terminated their employment and for a certain period prior thereto, they were paid at the rate provided for "substation operators."
 
 
 [3]
 "Settlement of Local and District Disputes
 "Should differences arise between the Mine Workers and the Operators as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately:
 
 
 [1]
 Between the aggrieved party and the mine management
 
 
 [2]
 Through the management of the mine and the Mine Committee
 
 
 [3]
 Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company
 
 
 [4]
 By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators
 
 
 [5]
 Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. * * *."
 "A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement."
 The Agreement of 1950, and all subsequent amendments and renewals thereof have additionally provided, in the "Miscellaneous" section thereof:
 "3. The contracting parties agree that, as a part of the consideration of this contract, any and all disputes, stoppages, suspensions of work and any and all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the `Settlement of Local and District Disputes' section of this Agreement * * *." (Emphasis supplied.)
 
 
 [4]
 Pettus v. Olga Coal Co., 1952, 137 W. Va. 492, 72 S.E.2d 881, involved the identical agreement which we have before us. There the complainants contended that they had not been paid proper overtime wages due them under the agreement. The court held that exhaustion of the arbitration procedures was a binding condition precedent to the right to seek relief in the courts
 
 
 [5]
 The only exception whereby an employee should be able to bring an action against the employer, despite the fact that the contract sets up a procedure for the resolution of his grievance, would be perhaps where the settlement of the grievance reached by the union and the company is arbitrary or unlawfully discriminates against the employee. See: Cox, "Rights Under a Labor Agreement," 69 Harv.L.Rev. 601, 630-634 (1956)
 
 
 [6]
 There may be some support for the plaintiffs' view that this is merely a contract suit governed by state law as in Transcontinental & Western Air v. Koppal, 1952, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325. However, this doctrine, under circumstances present in the instant case, would appear to conflict with the more recent Supreme Court cases cited above