The **INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LODGE NO. 1194, et al., Plaintiffs,**

v.

**GARWOOD INDUSTRIES, INC., et al., Defendants.**

**No. C 71-260.**

United States District Court,
N. D. Ohio, W. D.

Dec. 13, 1973.

Richard D. Betts, Robert D. Walker and John Thomas Patterson, Findlay, Ohio, Thomas Maguire, Robison, Curphey & O'Connell, Toledo, Ohio, for plaintiffs.

Charles W. Peckinpaugh, Jr. and Robert G. Clayton, Jr., Shumaker, Loop & Kendrick, Toledo, Ohio, for defendants.

## OPINION AND MEMORANDUM INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALINSKI, District Judge.

### JURISDICTION

This cause came to be heard on a complaint filed pursuant to 28 U.S.C. § 1332. Jurisdiction is further grounded in 29 U.S.C. § 185(a) and (b), which provides in part:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees who it represents * * *."

The Court finds jurisdiction proper herein on each of the asserted grounds. *See, e. g.,* International Union v. Textron, Inc., 312 F.2d 688 (6th Cir. 1963); Knoll v. Phoenix Steel Corp., 325 F. Supp. 666 (E.D.Pa.1971), aff'd, 465 F.2d 1128 (3rd Cir. 1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 (1973); Local No. 90 v. Welbilt Corp., 178 F.Supp. 408 (E.D.Mich.1959), aff'd, 283 F.2d 868 (6th Cir. 1960).

### FINDINGS OF FACT

1) This class action is brought on behalf of various classes of former employees of the Findlay Plant of Sargent Industries, Inc., asserting alleged rights to pension payments pursuant to a pension agreement entered into between the plaintiff union and Sargent's predecessor, GarWood Industries, Inc. The parties have stipulated to the propriety of this class action.

2) Proper notice has been made to members of the various classes bringing this action.

3) The plaintiff union represents those active employee/union members with at least ten (10) years of credited service prior to the closing of the plant and the termination of the pension plan.

4) The plaintiff, C. E. Reis, represents all those former employees of the defendant who were in a retirement status at the time the plant was closed and the plan terminated.

5) GarWood Industries, Inc. became a wholly-owned subsidiary of Sargent Industries, Inc., a Delaware corporation (hereinafter Sargent (Del.)), in an exchange of common stock.

6) Sargent (Del.) assumed the operation of the GarWood Findlay Plant on January 1, 1970.

7) A subsequent name change resulted in GarWood Industries, Inc., a Michigan corporation becoming Sargent Industries, Inc., a Michigan corporation (hereinafter Sargent (Mich.)).

8) There has been no evidence produced which would cause this Court to disregard the corporate structure of Sargent (Mich.) placing its liabilities directly upon its sole stockholder, Sargent (Del.).

9) The original pension agreement herein became effective October 31, 1955, between the plaintiff union and the defendant, Sargent (Mich.)'s predecessor in interest, GarWood Industries, Inc.

10) The final amendment of that plan was effective as of June 2, 1968, to run until June 1, 1971.

11) This action revolves primarily around an interpretation of certain contractual terms and their conjunctive relationship as contained within the pension agreement. Those portions of the plan relevant to this action are set out as follows:

a) Art. I, § 2: "The company agrees that, during the term of this Agreement, it will make payments into the Pension Fund in amounts which shall be sufficient to *fund the benefits on a sound actuarial basis.*" (*Emphasis added.*) (Pltf's Ex. 2–A, p. 3.)

b) Art. I, § 3: "* * * The benefits of the Plan shall be only such as can be provided by the assets of the Pension Fund and there shall be no liability or obligations on the part of the Company to make any further contributions to the Trustee in the event of termination of the Plan. No liability for the payment of benefits under the Plan shall be imposed upon the Company, the officers, Directors, or stockholders of the Company." (Pltf's Ex. 2–A, p. 3.)

c) Art. I, § 4: "Upon termination or discontinuance of the Plan, the assets then remaining in the Pension Fund, after payment or provision for payment of all expenses properly chargeable thereto, shall be allocated for the purpose of paying the pension and death benefits provided by the Plan (based on credited service to date of such termination or discontinuance), to employees who have retired or who would qualify to retire or for other benefits in the following order of precedence: First, to employees who shall have retired prior to such termination or discontinuance and their beneficiaries, without reference to the order of their retirement; Second, to employees who shall have become qualified to retire (but who have not retired) with benefits under the Plan prior to such termination or discontinuance and their beneficiaries, without reference to the order in which they shall have become so qualified to retire; Third, to employees with 10 or more years of credited service and former employees with vested deferred retirement benefits (provided such former employees respond within one year following the date of discontinuance to a written enquiry by the Company at the last known address shown in the records of the Company); and Fourth, to all other employees with a pension interest at date of termination of the Plan, but not beyond the value of such interest." (Pltf's Ex. 2–A, p. 3.)

d) Art. IV, § 1: "Any modification or amendment of the Plan may be made retroactively with the consent of the Union, if necessary or appropriate, to establish the deductibility of the Company's contributions under the Internal Revenue Code as now in effect or hereafter amended or any other applicable provisions of the Federal Tax Laws, as now in effect or hereafter amended or adopted and the regulations issued thereunder." (Pltf's Ex. 2–A, p. 18.)

e) Art. V: "The Company reserves the right to amend, modify or terminate the Plan by action of its Board of Directors, provided, however, that *no such action shall alter the Plan or its operation* (except as may be required by the Internal Revenue Service for the purpose of meeting the conditions required to establish the deductibility for income tax purposes of all payments made by the Company thereunder) in respect of employees covered by this Agreement in contravention of the provisions of this Agreement." (*Emphasis added.*) (Pltf's Ex. 2–A, p. 21.)

12) The plan in question allowed for the vesting of benefits for those employees with ten (10) years of service.

13) Full pension benefits were payable to retired employees upon reaching age sixty-five (65), along with a provision for an accelerated retirement at age sixty (60).

14) The pension plan contained a provision allowing for the payment of a death benefit of $500. Said payment to be made to the beneficiary of any deceased retiree.

15) The company terminated the plan on October 31, 1971, the date that Sargent (Mich.) closed its facility at Findlay, Ohio.

16) Certain functions of the Findlay facility were moved to the Sargent (Mich.), Wayne Plant in the State of Michigan; the balance of the product lines were discontinued.

17) The amount of the trust corpus at the time of termination was approximately $250,000.

18) In order to guarantee full pension benefits to each of those individuals who have vested rights by virtue of tenure, the corpus would necessarily require an additional funding in the amount of $1,030,000, approximately.

19) A: As of December 1, 1971, there were 116 retirees of Sargent (Mich.) who were receiving full or partial pension benefits. B: As of December 1, 1971, there were 121 employees of Sargent (Mich.) who had sufficient tenure to vest their benefits under the provisions of the plan. C: From (A) and (B) above, on December 1, 1971, there were 237 employees and retirees with vested status.

20) On October 31, 1970, there were sixty (60) former employees of Gar-Wood—Sargent who were on retirement status.

21) At the time that Sargent (Mich.) announced that the Findlay, Ohio, plant was to be abandoned, an actuarial aberration occurred. Many of those eligible for retirement but still working, retired. During the year October 31, 1970, to October 30, 1971, some 53 employees retired.

22) The Court finds that throughout the *continuing process of collective bargaining,* agents of the defendant and its predecessor in interest repeatedly assured the plaintiffs that the admittedly ambiguous language in the plan (i. e., sound actuarial basis, fully funded, vested, etc.) were in reference to a program that allowed for maximum deductible (26 U.S.C., § 401, et seq.) contributions. It was in reliance on those assurances that the plaintiffs predicated their economic package acceptance.

## CONCLUSIONS OF LAW

The courts have moved far afield from their early view of pension plans as mere gratuities, whose modification or termination was generally at the whim and caprice of the employer. The employer need only style the plan "noncontributory" and add the power of unilateral termination to make a pension:

"* * * a gratuitous arrangement by the company for the payment, at its option, of pensions to old employees. Any such mere gift, by plain and unambiguous language *which is not susceptible of construction* in favor of the employee, was 'expressly' made subject to denial, suspension, or permanent discontinuance by the company at any time." Fickling v. Pollard, 179 S.E. 582, 583 (Ga. App.1935).

The Report of the Committee on Labor and Public Welfare in regard to the Retirement Income Security for Employees Act of 1972 (S. 3598), in discussing the typical judicial response to pension plan terminations, held that:

"In almost every instance, participants lose their benefits not because of some violation of federal law, but rather because of the manner in which the plan is executed with respect to its contractual requirements of vesting or funding. Courts strictly interpret the plan indenture and are reluctant to apply concepts of equitable relief or to disregard technical document reading." *Id.* at 5.

To appreciate the magnitude of the problem, President Nixon ordered a study by the Departments of Labor and the Treasury, who found that about 3100 retired, retirement-eligible, and vested workers lost pension benefits through terminations in the first seven months of 1972, with losses totalling some ten million dollars. *See* President's message to Congress on Private Pension Plans (119 Congressional Record H 2595 [H.Doc.No.93–82] April 11, 1973.

Pension reform was again urged by the President in his message to Congress enumerating his legislative proposals for the 93rd Congress. 119 Congressional Record H 7670, September 10, 1973 (H.Doc.No.93– —).

The case before us is one that has received nationwide notoriety as a particularly heinous example. Senator Robert Taft, Jr. (R. Ohio) said, in his remarks to the Subcommittee on Labor's report of the Retirement Income Security for Employees' Act of 1972 (Committee Print, p. 107):

" * * * Recently, another instance was brought to my attention which may be the most tragic situation of all. Committee inquiries show that when GarWood closed its plant in Findlay, Ohio, all employees who had not yet attained retirement age lost all pension benefits, even where the bene-

fits were vested. Furthermore, employees who had already retired found their pensions reduced by approximately 62 percent."

Presently pension plans are principally affected by three federal enactments: The Internal Revenue Code of 1954 (26 U.S.C. §§ 401–404, 501–503); The Labor Management Relations Act (29 U.S.C. § 141 et seq.); and The Welfare and Pension Plans Disclosure Act (29 U.S.C. § 301 et seq.). Unfortunately none of these have served as an effective protector of the rights of those covered by private pension plans.

A great deal of discussion has made reference to the restrictive nature of the Internal Revenue Code and its effect upon the ability of the company herein to fully fund its accrued actuarial deficiency and have those payments considered to be deductible from the company's gross receipts in the calculation of taxable income. In order for the employer to deduct contributions to a pension trust, the trust must meet the requirements of 26 U.S.C. § 401. The amount of contribution allowable *and* deductible is expressed in terms of range. Pension costs are expressed as current actuarial cost (those incurred in the present taxable year) and unfunded actuarial deficiencies (those arising by virtue of a retroactive assumption of employee eligibility or a retroactive benefit increase in subsequent collective bargaining agreements). The Internal Revenue Code requires, for maintenance of the plan's qualified status, a contribution sufficient to cover current cost plus interest on the accrued actuarial deficiencies. The maximum deductible contribution would be: All the current cost plus 10% of the accrued actuarial deficiency. The defendant's actuary indicated at trial that, depending upon the stated interest rate, a plan of this kind could totally amortize its accrued actuarial deficiency in approximately 13 years without sacrificing the deductible character of its payments. The plan in question was in operation for approximately 16

years. The defendant constantly maintained a policy of *minimum* funding.

Courts in scattered jurisdictions have gradually begun to apply what amounts to a theory of unilateral contract to pension terminations, reasoning that power of modification/termination clauses are ineffective against employees who have complied with the conditions for entitlement. *See, e. g.,* Finnell v. Cramet, Inc., 289 F.2d 409 (6th Cir. 1961); Delaware Trust Co. v. Delaware Trust Co., 43 Del.Ch. 186, 222 A.2d 320 (1966); Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 171 N.E.2d 518 (1960); Schofield v. Zion's Co-op. Mercantile Inst., 85 Utah 281, 39 P.2d 342 (1934).

Although many courts have chosen to draw a distinction between contributory and non-contributory plans, it is the opinion of this Court that any attempted distinction is nebulous at best and ignores the realities of modern economics and labor management bargaining. *See Cantor, supra* at 410, 171 N.E.2d at 522. Where the Ohio Supreme Court declared that:

> "A retirement program has become a basic part of an employee's remuneration even as his wages are a part thereof, and a consideration flows to the employer as well as to the employee through such a program."

It is generally true that management offers an economic package worth a specific sum. Allocation of that sum between in-pocket wages and fringe benefits is left to the discretion of the labor representatives. The proposed Senate bill apparently accepts that analysis in its statement of purpose in regard to vesting:

> "In its final analysis, the issue basically resolves itself into whether workers, after many years of labor, whose jobs terminate voluntarily or otherwise, should be denied benefits they have earned as *deferred compensation* and which have been placed for them in a fund for retirement purposes." Committee Report, supra at 8–9.

For applicability of this analysis to the instant case, *see* plaintiff's Exhibit 21 [letter from plaintiff purporting to make allocation between pension fund and wage payments].

█ The pension program here can, in no way, be considered a gift which can be eliminated unilaterally, but rather is a reflection of the union's willingness to reduce its demands in other economic areas.

It is the position of the union that the terms "actuarially sound funding" read in conjunction with the vesting provisions of the plan was represented by the company and its predecessor, GarWood, to mean that the fund would be maintained at a level actuarially sufficient to maintain full benefits to all those eligible persons for as long as possible.

The plan contains an order of precedence in the payment of benefits, initially established in the third supplemental agreement. That order is: First, to those currently in retirement status regardless of the time at which they achieved that status; Second, to employees fully eligible for retirement but still actively employed; Third, to employees or former employees with tenure sufficient for vesting (10 years) who have not reached the requisite retirement age; and Fourth, all other employees with a retirement interest. The reduced guarantee levels with preference schedules were to take effect only if and when the fund is found to be insufficient due to changes in status unanticipated by the actuaries at the time of termination. That interpretation is a reasonable one in view of the fact that the plan contains a provision clearly designed to cover the complementary possibility. That section reads as follows:

> Art. I, § 6: "If, upon any termination or discontinuance of the Plan as provided in Section 4 of this Article I, *it shall* then or thereafter *be found* that after all liabilities of the Plan attributable to employees covered by this Agreement have been satisfied or provision for satisfaction in full made,

there is *an amount remaining in the Pension Fund attributable to erroneous actuarial computations*, then, and not otherwise, any such remaining amount and assets shall be paid over to the Company or upon its order, it being understood, that, anything in this Agreement to the contrary notwithstanding, it shall be impossible at any time prior to the satisfaction or provision for satisfaction in full of all liabilities with respect to employees covered by this Agreement, and their beneficiaries, for any part of the Pension Fund (other than such part as is required to pay expenses properly chargeable thereto) to be used for or diverted to purposes other than for the exclusive benefit of such employees or beneficiaries." (*Emphasis added.*)

No provision *specifically* speaks to the possibility of an actuarial understatement.

Defendants herein raise the issue of the admissibility of parol evidence in resisting an attempt by plaintiffs to contradict the language contained within the four corners of the pension agreement.

■ Generally, collective bargaining agreements find their basis for interpretation in the law of contracts and are subject to its rules of construction. *See,* Lewis et al. Trustees v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L. Ed.2d 442 (1960).

However, there has long been a recognition that collective bargaining agreements differ in significant respects from conventional commercial contracts. *See generally,* Cox, Archibald, Rights Under a Collective Bargaining Agreement, 69 Harv.L.Rev. 601 (1956); Cox, Archibald, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L. Rev. 1 (1958). *See also,* Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif.L.Rev. 718 (1973).

■ It is axiomatic that the courts will not go beyond the plain language of a written agreement to determine the

rights and obligations the signers of that agreement intended to create. No other rule of general application can exist if we are to credit at all the solemn, written pronouncements of competent parties to an arms-length transaction.

■ However, it is equally axiomatic that certain conditions may exist in which the decision maker should look beyond the plain language of an agreement to reach the essence of the bargain struck. Any language in a collective bargaining agreement must be read in the context of the custom and usage developed over years of modifying and perfecting a particular agreement. The parties herein, however tacitly, recognize that fact by giving the Court a chronological summary of the progress of the plan in question from its inception in 1955 through the unilateral termination of 1971. Thus, any interpretation of the contract would necessarily involve a study of the manner in which the parties, themselves, in the course of administering their contract read and interpreted it. The numerous exceptions to the parol evidence rule show that the written document is no more than evidence of the underlying real or core substance of an agreement.

■ One of the most commonly recognized exceptions to the parol evidence rule is applicable herein. The heart of the dispute herein is couched in ambiguities. A review of the deposition filed herein by the defendant's actuary reveals that the contested issues are certainly capable of multiple interpretations. In discussing the term "fund the benefits" Mr. Dant said that it was "so general as to have almost any interpretation." *See Dant* depo., p. 23. "Sound actuarial basis" is "a term that unfortunately, like a number of terms, has not acquired a unique definition in any sense." *Dant* depo., p. 19. A conjunctive assembly of those two expressions does little to clarify their meaning. Since "both terms \* \* \* are fairly vague and general", Mr. Dant can only come up with a "subjective feeling, \* \* \* rather than a precise defini-

tion." *Dant* depo., p. 23. Mr. Dant's testimony at trial merely reinforced his statements made in his earlier deposition. The interface between accounting and actuarial science has produced terms whose definitions are still totally subjective. It is therefore impossible to ascribe an objective standard to the language of the plan by which the parties intended to manifest their intent. Words are used by men to convey a variety of meanings variable with time, place and circumstance. When, as here, the language becomes less parochial and moves beyond linguistic simplicity, it is incumbent upon the Court to move behind the written word to determine the intent of the parties.

Before the legal operation of any agreement can be determined, however definitely it may be embodied in a written "integration," it must be interpreted by the Court. For this process of interpretation, the parol evidence rule does not exclude evidence of prior communications and understandings. Until a contract has been interpreted, the Court cannot know whether there is an inconsistency between it and other agreements, oral or written, prior or subsequent. The Court thus will accept testimony to determine whether there existed an agreement between the parties on the meaning of the expressions here at issue.

It therefore appearing to the Court that the pension plan as bargained for required the defendant herein to fully fund the plan in current cost and make the maximum contribution toward retirement of the accrued actuarial deficiency allowable as a deduction from gross income under the Internal Revenue Code, it is

Ordered that the parties prepare an accounting indicating the size of the trust corpus at the time of termination, assuming said *maximum* annual contribution beginning in October of 1955 and culminating October 31, 1971. That figure (recalculated corpus) should be applied to the preference schedule in the plan to determine retroactive pension payments owing from the termination to date. Interest at a rate of 6% per annum shall be added to the unadjusted recalculated corpus. The figure thus arrived at [recalculated corpus and interest minus retroactive payments to pensioners] may be used to purchase an annuity pursuant to Art. I, § 5, of the Plan.

It is further ordered that plaintiff's counsel are entitled to reasonable attorneys' fees and shall submit, as part of the accounting above, a statement of those costs.