Emmett THOMAS, Mart F. Brennan, and John D. Jillson, Trustees of the Anthracite Health and Welfare Fund, Plaintiffs,

v.

READING ANTHRACITE COMPANY, Defendant.

Civ. No. 9267.

United States District Court
M. D. Pennsylvania.

Dec. 30, 1966.

Charles A. Shea, Jr., Wilkes-Barre, Pa., Charles A. Wolfe, Thomas N. O'Neill, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiffs.

Anthony J. Urban, Joseph Holochuck, Pottsville, Pa., for defendant.

## MEMORANDUM

NEALON, District Judge.

Plaintiffs, Trustees of the Anthracite Health and Welfare Fund, brought suit under Section 301(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185, to collect payments of royalties allegedly owed them by defendant, Reading Anthracite Company, under the terms of the Anthracite Wage Agreements of February 1, 1959, and September 1, 1964.

Defendant has filed a motion under Rule 12(b) in which it seeks:

1. to dismiss the action for the reason that the complaint fails to state a claim against the defendant upon which relief can be granted;

2. to dismiss the action for the reason that the Court lacks jurisdiction under § 301(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185, in that plaintiffs are not a labor organization, are not representing employees, and have never entered into a contract with defendant within the meaning of the Act;

3. to dismiss the action for the reason that diversity of citizenship does not exist between plaintiffs and defendant and, therefore, the Court lacks jurisdiction;

4. to dismiss the action for the reason that the Court lacks jurisdiction of the subject matter in that the Anthracite Health and Welfare Fund is not subject to Federal law;

5. to dismiss the action for the reason that the complaint fails to join an indispensable party, viz., the United Mine Workers of America, and

6. to order the plaintiffs to furnish defendant with a more definite statement of their claim for the reason that the complaint is so vague and ambiguous that defendant should not be required to prepare a responsive pleading.

Passing over Argument Number 1 enumerated above for the time being, we will briefly consider defendant's remaining Arguments. Defendant's Arguments Numbers 2, 3, 4 and 5 were considered and rejected by this Court in Emmett Thomas, et al. v. Honeybrook Mines, Inc., No. 8499 Civil (Memorandum dated March 30, 1965).

In Honeybrook we concluded that a suit by Trustees to collect royalties allegedly due them under the terms of a collective bargaining contract was cognizable in Federal Court under Section 301(a). Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246; Dowd Box Company v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483. Obviously, if jurisdiction exists under § 301(a), then there is no need for diversity of citizenship between the parties. Further, we held in Honeybrook that the Trustees are the proper parties to enforce payments to the Fund and the United Mine Workers

of America is not an indispensable party. United Mine Workers of America, District 22 v. Roncco, 314 F.2d 186 (10th Cir. 1963); Lewis v. Quality Coal Corp., 243 F.2d 769 (7th Cir. 1957). Finally, defendant's contention that the complaint is vague and ambiguous is held to be without merit. The complaint sufficiently informs defendant of the nature of the claim and the relief sought in accordance with accepted Federal practice.

Returning now to defendant's first Argument, it is contended that royalty payments cannot be legally made by the defendant to the plaintiffs because the Anthracite Health and Welfare Fund does not comply with the statutory requirements of the Labor-Management Relations Act. Specifically, defendant asserts that § 302(a) of the Act, 29 U.S.C. § 186(a), provides that it shall be unlawful for any employer to pay any money to a representative of any of his employees or to any labor organization which represents any of his employees, excepting, however, payments to a trust fund established by such representative for the sole and exclusive benefit of his employees, their families and dependents, which trust fund must contain certain minimum requirements.[1] According to

---

1. Section 302 provides, in pertinent part:

"(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to any employer or who acts in the interest of any employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

\* \* \* \* \*

(c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide for any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; \* \* \*

\* \* \* \* \*

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

(e) The district courts of the United States and the United States courts of the Territories and possessions shall have

defendant, the trust fund involved herein does not meet these requirements and does not qualify under the Act because:

(a) the purposes for which payments may be made from the Anthracite Health and Welfare Fund are not limited or restricted to those permitted by Section 302(c) (5) (A) of the said Statute;

(b) the provisions of the Fund do not set up a detailed basis on which payments are to be made from the Fund, and there is no written agreement with the employer setting out the detailed basis on which payments are to be made from the Fund;

(c) the employees and employers are not equally represented in the administration of the Fund, inasmuch as two of the three Trustees are officers of local Unions of the United Mine Workers;

(d) there is no written agreement providing that employers and employees shall agree on an impartial umpire to decide disputes in the administration of the Fund or, in the event of their failure to agree within a reasonable length of time, that an impartial umpire shall be appointed on petition of either group by the United States District Court of the District where the Fund has its principal office; and

(e) it appears that the agreement for the administration of the Fund does not contain the provisions for annual audit and statement of results to be available for inspection, as required by the aforesaid statute.

(f) The provisions of the Anthracite Health and Welfare Fund, as set out in the Complaint, do not comply with the requirements of Section 302(c) (5) (C) in that payments to be used for providing pensions or annuities are not required to be made to a separate fund which provides that such funds cannot be used for any purpose other than paying pensions or annuities.

Assuming that the Arguments advanced are proper under a Rule 12 motion, we will treat these points seriatim.

## I THE PURPOSES FOR WHICH PAYMENTS MAY BE MADE ARE NOT LIMITED TO THOSE PERMITTED BY SECTION 302(c) (5) (A).

Section 302(c) (5) (A) (see footnote 1), recognizes the validity of payments to a trust fund provided the money is used for the purpose of paying certain enumerated benefits for the employees, their families and dependents. The Anthracite Wage Agreement of September 1, 1964, provides for certain amendments to the Anthracite Health and Welfare Fund as follows:

"1. The Fund heretofore created shall be held in trust irrevocably and shall endure as long as the purposes for its creation shall exist. Said purposes shall be to pay either from principal or income or both, the following:

(a) benefits to employees of said operators, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or life insurance, disability and sickness insurance or accident insurance;

(b) benefits with respect to wage loss not otherwise compensated for at all or adequately under the provisions of Federal or State law;

(c) benefits on account of sickness, temporary disability, permanent disability, death, or retirement;

(d) benefits for any and all other purposes which may be specified, provided for or permitted in Section 302(c) of the 'Labor-Management Relations Act, 1947' and the amendments thereto, as agreed upon from

jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of sections 101–115 of this title.

(f) This section shall not apply to any contract in force on June 23, 1947, until the expiration of such contract, or until July 1, 1948, whichever first occurs."

time to time by the Trustees including the making of any or all of the foregoing benefits applicable to the individual members of the United Mine Workers of America and their families and dependents, and to employees of the operators other than those exempted from this Agreement; and

(e) benefits for all other related Welfare purposes as may be determined by the Trustees within the scope of the provisions of the aforesaid 'Labor-Management Act, 1947' and its amendments."

■ The purposes mentioned in the amendments are practically identical with, and taken verbatim from, the wording of the Statute. Moreover, this language is the same as that contained in the National Bituminous Coal Wage Agreement of 1950 and about which, the United States Supreme Court in Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442, had this to say:

"The provisions of the collective bargaining agreement creating the fund include the express provision that this Fund is an irrevocable trust created pursuant to Section 302(c) of the 'Labor Management Relations Act, 1947.' Another provision specifies that the purposes of the fund shall be all purposes 'provided for or permitted in Section 302(c).' In this way the agreement plainly declares what the statute requires, namely, that the fund shall be used 'for the sole and exclusive benefit' of the employees, their families and dependents. Thus, the fund is in no way an asset or property of the union."

Apparently, this wording was first adopted in the Anthracite agreement on September 1, 1964, and this would suggest that the previous language was not as precise or appropriate, but this is of no moment. We are concerned here with a suit for money allegedly unpaid and due now under a collective bargaining contract, and prior non-compliance, if

such were the case, does not defeat a present obligation. Accordingly, I hold that the purposes named in the Agreement are in accord with the requirements of § 302(c) (5) (A).

II THE DETAILED BASIS ON WHICH PAYMENTS ARE TO BE MADE IS NOT SPECIFIED IN A WRITTEN AGREEMENT WITH THE EMPLOYER AS REQUIRED BY SECTION 302(c) (5) (B).

Defendant asserts in its brief that " * * * there is no written agreement whatsoever wherein the employer is notified on a detailed basis as to the administration of said Fund. * * * " Plaintiffs challenge this assertion and point to Paragraph 13 of the Anthracite Wage Agreement of September 1, 1964, which provides:

"13. It is agreed by the parties hereto that they and each of them adopt, ratify, affirm, and agree to all acts and decisions of the said Trustees which have been reduced to writing relative to the basis upon which payments have heretofore been made and are presently being made from the said Fund. It is further agreed that the detailed basis (if additional details are required) upon which payments from the Fund will hereafter be made, shall be resolved in writing by the Trustees on the date or dates as may by them hereafter be agreed upon and as experience and proper administration of the Fund may require."

■ It is plaintiffs' position that Paragraph 13 satisfies the statutory requirement that " * * * the detailed basis on which such payments are to be made is specified in a written agreement with the employer. * * * " Obviously, the employer parties to the contract considered the statutory requirement and delegated the working out of specifics to the Trustees. This type of arrangement was approved and held to comply with the Act in Van Horn v. Lewis, 79 F.Supp. 541 (D.C.D.C.1948), and Ramsey v. United Mine Workers of America Wel-

fare and Retirement Fund, 231 F.Supp. 909 (E.D.Tenn.1964). In Ramsey, the Court determined that " * * * the establishment of a legally enforceable method of arriving at a detailed basis for distributing welfare trust funds is sufficient to comply with Section 302(c) (5)." I agree with and adopt the reasoning announced in Van Horn (supra) and Ramsey (supra).

III THE EMPLOYEES AND EMPLOYERS ARE NOT EQUALLY REPRESENTED IN THE ADMINISTRATION OF THE FUND AS REQUIRED BY SECTION 302(c) (5) (B).

In order to place this Argument in its proper perspective, a brief history of the Fund and the appointment of Trustees as revealed by the pleadings and briefs is in order. The provision for an Anthracite Health and Welfare Fund was first included in the Anthracite Wage Agreement of June 7, 1946, and it provided for appointment of Trustees, as follows:

"An Anthracite Health and Welfare Fund is hereby created and there shall be paid into said Fund by each signatory operator, the sum of five cents ($0.05) per ton on each ton of anthracite produced for use or sale. This Fund shall be managed by three trustees, two appointed by the President of the United Mine Workers of America, and one appointed by the Anthracite Operators. Successor trustees shall be chosen in the same manner."

Pursuant to this proviso, Thomas Kennedy and Mart F. Brennan were appointed by the United Mine Workers as its two trustees and Robert L. Birtley was selected as the representative of the employers. The Labor-Management Relations Act became law in 1947 and provided that the employees and employers were to be equally represented in the administration of the fund together with such neutral persons as the representatives of the employers and the employees may agree upon. (See footnote 1.) Subsequently, in the Anthracite Wage Agreement of July 3, 1948, the following amendment was adopted:

"Article 4, first paragraph, strike out the last two sentences in said paragraph and insert the following: 'It is agreed by the parties, signatories hereto, and each of them (being the identical parties signatories to the Agreement of June 7, 1946, as amended July 10, 1947) as a part of the consideration for this Agreement, that the three (3) duly named, appointed, qualified and presently acting Trustees of said Fund, to wit: Thomas Kennedy, Robert L. Birtley and Mart F. Brennan, be and they are hereby recognized and accepted as the three (3) Trustees to operate said Fund as it shall hereafter be operated and administered. It is understood and agreed by the parties and each of them that said Trustees shall have equal power and authority in the administration and operation of said Fund; and that a decision of a majority thereof (i. e., any two (2) of said Trustees) shall be controlling on all questions and that the acts and decisions of the majority shall control and bind all of said Trustees. The appointment of Trustee Kennedy (heretofore made and hereby ratified) shall be construed and accepted by the parties as being the appointment by the United Mine Workers of America, the appointment of Trustee Birtley (heretofore made and hereby ratified) as being the appointment by the Anthracite Operators and the appointment of Trustee Brennan (heretofore made and hereby ratified) as being the joint appointment of the United Mine Workers of America and the Anthracite Operators and mutually satisfactory to them and each of them. Successor Trustees shall be chosen in the following manner, i. e., one (1) by the President of the United Mine Workers of America, one (1) by the Anthracite Operators and one (1) by the joint appointment of the parties, this joint appointee so chosen being equally the appointee of each of said

parties in the administration of said Fund."

Robert L. Birtley is no longer the employer representative and was succeeded in that capacity by John D. Jillson, who was identified in the Anthracite Wage Agreement of September 1, 1964, " * * as being the appointment of the Anthracite Operators." Thomas Kennedy was succeeded as the employee representative by Emmett Thomas, who was appointed on February 13, 1963, by W. A. Boyle, Acting President of the United Mine Workers of America. Mart F. Brennan, designated as the "neutral trustee"[2] has functioned as a Trustee since the inception of the Fund. Defendant argues in its brief:

> "The composition of the Board of Trustees shows that two out of the three member Trustees are presidents of local unions, with the supposedly neutral person being one of these presidents.[3] This arrangement is in violation of the mandatory provisions of the Act requiring the necessity of a neutral person in the administration of the Fund."

Because of this, defendant states that it cannot legally forward contributions allegedly due plaintiffs. Defendant does not suggest a corrective remedy, so apparently it relies on these defects as constituting a defense to the action.

The question immediately arises: Should defendant, a party signatory to the Wage Agreement which provides for a Trust Fund and its administration, now utilize alleged defects in that Agreement relative to the Trust Fund as a basis for dismissing an action by the Trustees to collect delinquent payments to the Fund? The composition of the Board of Trustees certainly raises questions and invites inquiries, although there is no charge made by defendant that the Fund has been improperly or irregularly administered. Defendant argues that the fact that the Board did not abuse its power would be irrelevant. See Local No. 2, etc. v. Paramount Plastering, Inc., 310 F.2d 179 (9th Cir. 1962), where it was held that Section 302 is aimed primarily at the prevention of possible abuse and not at providing a remedy for abuse actually perpetrated. See also, Employing Plasterers' Association of Chicago v. Journeyman Plasterers' Protective & Benevolent Society of Chicago, 279 F.2d 92 (7th Cir. 1960). Therefore, there is no issue of irregularity or maladministration before the Court. In considering the question posed above, we are aided by expressions of the United States Supreme Court contained in three cases. The background giving rise to regulatory legislation in the welfare fund field was alluded to by the Supreme Court in United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956):

> "In 1946 Congress was disturbed by the demands of certain unions that the employers contribute to 'welfare funds' which were in the sole control of the union or its officers and could be used as the individual officers saw fit. The United Mine Workers' demand that mine operators create a welfare fund for the union by contributing 10 cents for each ton of coal mined, caused the Congress to act * * *."

Subsequently, the Supreme Court considered Fund problems once again in Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), and, in reviewing the Act's legislative history, explained:

> "Congress believed that if welfare funds were established which did not

2. See also, Anthracite Wage Agreement of September 1, 1964. Neither side has raised the question as to who has the appointing power of the neutral Trustee; that is, the employer and employee signatories to the Wage Agreement or the Trustee representatives appointed by each side. Consequently, that question will not be considered.

3. Emmett Thomas, the employee representative, is identified as the Acting President of Local #1 of the United Mine Workers, while Mart F. Brennan, the neutral Trustee, is identified as the President of Local #7 of the United Mine Workers.

**346**

define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. See 92 Cong.Rec. 4892–4894, 4899, 5181, 5345–5346; S.Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong.Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established. See Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 274, 290. *Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e).*" (Emphasis supplied.)

In Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1959), the Trustees for the Bituminous Welfare Fund brought suit against an employer which had withheld payment of royalties under the National Bituminous Coal Wage Agreement of 1950, contending that its duty to pay royalties to the Trustees was excused when the Union violated the agreement by strikes and stoppages of work. The language of Mr. Justice Brennan, speaking for the Court in rejecting the employer's alleged defense and in holding that the Union's performance of its promises is not a condition precedent to employer's duty to pay royalties, is pertinent here. Acknowledging that a third-party beneficiary has made no promise and therefore has breached no duty to the promisor, Mr. Justice Brennan proceeds further and says:

"This collective bargaining agreement, however, is not a typical third-party beneficiary contract. The promisor's interest in the third party here goes far beyond the mere performance of its promise to that third party, i. e., beyond the payment of royalty. It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death. While employers in many other industries assume this burden directly, this welfare fund was jointly created by the coal industry and the union for that purpose. *Not only has Benedict entered into a long-term relationship with the union in this regard, but in compliance with § 302(c) (5) (B) it has assumed equal responsibility with the union for the management of the fund. In a very real sense Benedict's interest in the soundness of the fund and its management is in no way less than that of the promisee union.* This of itself cautions against reliance upon language which does not explicitly provide that the parties contracted to protect Benedict by allowing the company to set off its damages against its royalty obligation."

\* \* \* \* \* \*

"Furthermore, Benedict promised in the collective bargaining agreement to pay a specified scale of wages to the employees. *It would not be contended that Benedict might recoup its damages by decreasing these wages. This could be rationalized by saying that the covenant to pay wages is included in separate contracts of hire entered into with each employee. The royalty payments are really another form of compensation to the employees, and as such the obligation to pay royalty might be thought to be incorporated into the individual employment contracts.* This is not to say that the same treatment should necessarily be accorded to royalty payments as is accorded to wages, but the similarity militates against the inference that the parties intended that the trustees' claim be subject to offset.

"Finally a consideration which is not present in the case of other third-party beneficiary contracts is the impact of the national labor policy. Section 301 (b) of the Taft-Hartley Act, 29 U.S.

C.A. § 185(b), provides that '[a]ny money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.' At the least, this evidences a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it. *Although this policy was prompted by a solicitude for the union members, because they might have little opportunity to prevent the union from committing actionable wrongs, it seems to us to apply with even greater force to protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs. Thus the national labor policy becomes an important consideration in determining whether the same inferences which might be drawn as to other third-party agreements should be drawn here."* (Emphasis supplied.)

██ In analyzing the rationale of Ryan, Arroyo and Benedict, it appears that consideration of social welfare with regard to the benefits payable to miners from the Fund makes it inappropriate to admit defenses based upon the alleged misdeeds of the Union. Lewis v. Harcliff Coal Co., 237 F.Supp. 6 (W.D.Pa. 1965). This rationale was extended in Lewis v. Mill Ridge Coals, Inc., 298 F.2d 552 (6th Cir. 1962), where the employer refused to pay royalties to the Bituminous Trust Fund because of alleged misconduct by the Trustees constituting a breach of the Agreement. In rejecting this predication, the Court relied on the authority of Lewis v. Benedict (supra), and noted:

"A fair reading of Benedict discloses the Court's purpose to give the ultimate beneficiaries of the welfare Fund (the men who mined the coal, and their dependents) a status that would in-

sulate them from the consequences of a breach of the contract by either the Mine Workers Union, as promisee, or the trustees of the Fund, as fiduciaries charged with the administration of the Fund."

Moreover, the responsibility for the management and administration of the Fund is shared equally by the employer and the Union. As an additional vehicle to enforcement of this responsibility, access to the United States District Courts to restrain violations of Section 302 is expressly provided in Section 302(e). That this remedy was provided by Congress for situations such as we have here was recognized in Employing Plasterers' Association of Chicago v. Journeyman Plasterers' Inc. (supra), wherein it was observed:

"Unilateral termination by the employer-contributors of allegedly illegal contractual obligations may subject them to an action for breach of the collective bargaining agreement. The benefit conferred upon the Association by a test of the legality of the welfare funds and a restraint of violations of Section 302 is the bestowing of legal posture on payments and on the administration of welfare funds and the removal of the onus of participation in a continuing violation which may subject the Association to possible criminal sanctions * * *"

See also, William Dunbar Co. v. Painters & Glaziers District Council, 129 F.Supp. 417 (D.C.D.C.1955), where the Court reviewed Section 302 and declared:

"There is in the preamble of this section the language that he probably overlooked, and that is, that 'it will be unlawful for any employer to pay, or for any representative of any employees to receive from the employer, money or other thing of value in an industry affecting commerce except with respect to money or other thing of value paid to a trust fund.'

"That language was very deliberately intended to prevent kickbacks, prevent bribes, prevent things which would make for labor racketeering. *And the*

*business of exculpating the trust was put in there, that beyond the penalties which are purely criminal, there could be injunctive powers for quick and speedy remedy."* (Emphasis supplied.)

It is true that in Employing Plasterers' Association of Chicago v. Journeyman Plasterers', etc. (supra), the Court stated that "(e)mployers have a statutory duty to refrain from making welfare fund contributions to 'representatives' of their employees unless the funds are administered as the statute provides * * *", but in that case the employers were seeking to restrain defendants from demanding employer contributions until statutory safeguards were observed. The opinion pointed out:

> "Employers who are thus charged with statutory duties and who may be subject to criminal penalties for violations of this section have a sufficient interest in the legality of welfare funds, as defined in the statute, to invoke the remedy provided in Section 302(e) for alleged violations of the section."

The employer is not relieved of his duty to correct inequities or allegedly illegal facets of the Fund and cannot blandly sit by after making royalty payments for many years [4] and assert that he has no obligation to honor his contractual commitment to pay royalties into a Fund which provides benefits for employees, former employees and beneficiaries, " * * * many of whom may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs." Lewis v. Benedict (supra). Defendant, in this case, has misconstrued and misunderstood its legal responsibility. As was observed by Chief Judge Sobeloff in his dissenting opinion in Lewis v. Lowry, 295 F.2d 197 (4th Cir. 1961):

> "The Trust Fund's obligation to pay benefits to Lowry's employees could not be affected by secret understandings between the coal company and the

union; neither may the employer's obligation to pay royalties to the Trustees be diminished by clandestine arrangements between the employer and the union."

And I might add, neither may the employer's obligation to pay royalties be diminished by the fact that the plan *adopted by the employer and the Union to receive and administer the Fund,* does not fully qualify with the Act, especially so when there is a remedy readily available under Section 302(e). For these reasons, defendant's Argument on this point is unpersuasive.

## IV THERE IS NO WRITTEN AGREEMENT PROVIDING FOR THE APPOINTMENT OF AN IMPARTIAL ARBITRATOR AS REQUIRED BY SECTION 302(c) (5) (B).

■ This contention of defendant is unsupported by the record in this case. The Anthracite Wage Agreement of September 1, 1964, provides, in pertinent part, as follows:

> "5. In the event of a deadlock in the administration of the said Fund or in the event of a deadlock on the appointment of a successor neutral trustee, an impartial umpire shall be selected by the agreement of the two trustees, representing the contracting parties hereto, to decide such dispute; or in the event of their failure to select such an umpire within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either of the aforesaid trustees, be appointed by the District Court of the United States for the Middle District of Pennsylvania. It is agreed by the parties hereto that the words within a reasonable length of time as used in this Section of the Wage Agreement means a period of time not to exceed ten (10) days."

The weakness of defendant's Argument on this point is manifest.

---

4. According to the affidavit of Emmett Thomas, Reading Anthracite Company has paid the Anthracite Health and Welfare Fund a total of $4,714,490.72 to date, its most recent payment of $82,825.61 for coal produced in the month of August, 1966, was made on September 19, 1966.

## V THE AGREEMENT FOR THE ADMINISTRATION OF THE FUND DOES NOT PROVIDE FOR AN ANNUAL AUDIT AS REQUIRED BY SECTION 302(c) (5) (B).

The Anthracite Wage Agreement of September 1, 1964, states: ·

"11. An annual audit of the said Fund shall be made by competent auditors designated by the Fund. A statement of the results of . such audits shall be available for inspection by interested persons at the principal office of the Trust Fund, situated at Broad and Vine Streets, Hazleton, Pennsylvania."

Once again, defendant's contention finds no support in the record.

## VI THERE IS NO COMPLIANCE WITH THE REQUIREMENT OF SECTION 302(c) (5) (C) THAT PAYMENTS MUST BE MADE TO A SEPARATE TRUST WHICH PROVIDES THAT THE FUNDS HELD THEREIN CANNOT BE USED FOR ANY PURPOSE OTHER THAN PAYING PENSIONS OR ANNUITIES.

The Anthracite Wage Agreement of September 1, 1964, set forth, in pertinent part:

"12. The aforesaid Trustees shall designate a portion (which may be changed from time to time) of the payments to the Fund herein provided, as a separate irrevocable Trust Fund to be used by said Trustees for the sole purpose of paying pensions or annuities to the United Mine Workers of America, their families and dependents, or such other persons as may be properly included as beneficiaries thereunder."

Moreover, the affidavit of plaintiff Emmett Thomas, filed in this case, avers that on June 3, 1966, the Trustees unanimously adopted and forwarded to their depository bank the following resolution:

"Resolved that Account #1 046 411 entitled 'Anthracite Health and Welfare Fund, Pension and Retirement Fund' in the National Bank of Washington be and is hereby designated as a separate irrevocable trust and all funds presently therein, together with all funds deposited therein in the future, shall be used solely for the purpose of paying pensions and annuities to employees as authorized by the Trustees."

From the record, therefore, it appears that defendant's assertion is unsubstantiated and will be rejected.

 Summing up, I conclude that this Court has jurisdiction to try the issues in this case; that plaintiffs' complaint states a cause of action upon which relief can be granted; that the alleged failure of the contracting parties to comply with the requirements of Section 302(c) is not a defense to this action; that the United Mine Workers of America is not an indispensable party; that plaintiffs' complaint is sufficient in form and content to enable defendant to file a responsive pleading, and finally, with the exception of defendant's contention concerning the alleged illegal composition of the Board of Trustees, which need not be determined at this time in light of the principles hereinabove referred to, the remaining Arguments of defendant are found to be without merit.

Motion denied.