**TRUSTEES OF the SOUTHERN CALIFORNIA IBEW–NECA PENSION PLAN, et al., Plaintiffs,**

v.

**JAM FIRE PROTECTION, et al., Defendants.**

Case No.: CV 08–2357 ABC (JWJx).

United States District Court, C.D. California.

Nov. 3, 2009.

Christopher M. Laquer, J. Paul Moorhead, Laquer Urban Clifford and Hodge LLP, Pasadena, CA, for Plaintiffs.

Donna E. Kirkner, Lax & Stevens, Robert F. Keehn, Robert F. Keehn Law Office, Los Angeles, CA, for Defendants.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

AUDREY B. COLLINS, District Judge.

Pending before the Court is a renewed motion for summary judgment filed on August 31, 2009 by Plaintiffs, which are various union-related trusts and other union-related entities (together the "Union"). Defendant JAM Fire Protection ("JAM") opposed on September 21, 2009, and the Union replied on September 28, 2009. Also pending is JAM's cross-motion for summary judgment, filed on September 2, 2009. The Union opposed on September 21, 2009 and JAM replied on September 28, 2009. The Court previously found these matters appropriate for resolution without oral argument and vacated the November 2, 2009 hearing date. *See* Fed. R.Civ.P. 78; Local Rule 7–15. For the reasons below, the Court GRANTS the Union's motion and DENIES JAM's motion.

## I. BACKGROUND [1]

The Union brought this action under the Employee Retirement Income Security Act against JAM, a company that performs electrical work on construction projects. This action centers around work JAM did for the Los Angeles Unified School District ("LAUSD"). Pursuant to that work, JAM was subject to a Project Stabilization Agreement ("PSA")

---

1. The parties filed evidentiary objections with respect to the pending motions. The Court has considered these objections in reaching the conclusions herein and the objections are overruled to the extent that they are inconsistent with this ruling. *See Gates v. Deukmejian,* 987 F.2d 1392, 1400 (9th Cir.1992).

and a Local 11 Inside Wiremen's Agreement ("IWA"). The Union alleges that JAM failed to make proper benefit contributions per the agreements because JAM improperly hired and classified seventeen workers (the "Seventeen") as apprentices, rather than journeyman. Under the agreements, benefit contributions for apprentices are less than those for journeymen. The Union claims that the seventeen workers classified by JAM as apprentices should have been classified as journeymen, so the contributions made for those employees at the apprentice rate should have been made at the journeyman rate. JAM, the Union argues, owes an additional $272,738, and related costs, to make up the difference between the rates.

The PSA and IWA are the bargaining agreements which governed JAM's benefit contributions. The PSA is an overarching agreement that was entered into between the LAUSD on the one hand and the Los Angeles/Orange Counties Building and Trades Council (the "Council") and associated craft unions on the other hand. (Slawson Decl., Ex. A (PSA at 1–3).) The IWA is an agreement between the local chapter of the National Electrical Contractors Association and Local 11, the resident branch of the International Brotherhood of Electrical Workers. (Reed Decl., Ex. A (IWA at 1).) Because JAM worked on certain projects for the LAUSD, it was bound by the terms of both the PSA and IWA. (Union's Separate Statement Nos. 6–9.)

Section 5.2 of the PSA mandates that "Contractors shall pay contributions to the employee benefit funds in the amounts designated in the appropriate Schedule A ..." (PSA § 5.2.) The "appropriate Schedule A," for present purposes, is the IWA. (See PSA § 2.7 (Schedule As "are the local collective bargaining agreements").)

The IWA requires that employers contribute to the National Electrical Benefit Fund, local pension, and other funds, on behalf of all journeymen. (See IWA at 16.) Likewise, "[t]he employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured." (IWA § 5.11.) Certain contributions for apprentices are less than for journeymen. For instance, some contributions are based on the employee's wage. (See, e.g., IWA § 6.01.) Because apprentices are paid less than journeymen (IWA § 3.05), the contribution requirement will also be less.

The PSA and IWA both provide for the use of journeymen and apprentice employees. (PSA §§ 14.1–14.3; IWA § 5.01.) Article V of the PSA requires payment of wages set by the prevailing wage rates issued by the California Department of Industrial Relations. (PSA, Art. V.) Those prevailing wage determinations set rates for journeymen and comparatively lower rates for apprentices. (See Slawson Decl., Exs. B–C.) The IWA, as incorporated by the PSA, required JAM to pay those rates for journeymen and the lower rates for apprentices, as "apprentice" is defined in the IWA. (Union's Separate Statement Nos. 14–15.)

Article V of the IWA is titled "Standard Inside Apprenticeship & Training Language." (IWA, Art. V.) Section 5.01 calls for a "local Joint Apprenticeship and Training Committee (JATC)." (IWA § 5.01.) The JATC is made up of six to eight members, half of whom are to be appointed by "the local chapter of the National Electrical Contractors Association (NECA)" and the other half by "the local union of the International Brotherhood of Electrical Workers (IBEW)." (IWA § 5.01.) The JATC is "responsible for the training of apprentices, journeymen, instal-

lers, technicians, and all others (unindentured, intermediate journeymen, etc.)."[2,3] (IWA § 5.01.) The JATC also has "full authority for issuing all job training assignments and for transferring apprentices from one employer to another." (IWA § 5.06.)

Article V of the IWA also provided that apprentices must be supervised by journeymen at all times, may not supervise others, and cannot be the first employees assigned to a jobsite. (IWA § 5.13.) JAM abided by those limitations when utilizing the Seventeen. (Mongillo Decl. ¶ 6; Deushane Decl. ¶¶ 4–5.)

JAM employed the Seventeen, who were not members of the Electrical Training Institute of Southern California. (Davis Decl. ¶ 8.) None of the Seventeen was dispatched to JAM from a joint labor/management apprenticeship program. (Moorhead Decl. ¶ 3.) All of the Seventeen were enrolled in a state-approved apprenticeship program called the Associated Builders and Contractors of Los Angeles/Ventura Inc. ("ABC"). (Vigil Decl. ¶¶ 2, 5.)

The Seventeen were classified by JAM as "Inside Wiremen Apprentices." (See Cuadras Decl. ¶ 7.) JAM employed the individuals comprising the Seventeen only after Local 11 failed to dispatch an apprentice within 48 hours of JAM's request for an apprentice. (Deushane Decl. ¶ 4.) JAM made benefit contributions based on the status of the Seventeen as apprentices. Had JAM made benefit contributions at "the applicable standard journeyman rates" (Cuadras Decl. ¶ 8), JAM would

have made an additional $272,738.63 in contributions (Cuadras Decl. ¶ 11).

On April 3, 2008, Local 11 filed a grievance against JAM and one of the issues raised was in part whether JAM had violated the PSA "by paying employees as apprentices when working on PSA projects if they are not then enrolled and in good standing in a jointly-managed labor-management apprenticeship program." (Reed Decl., Ex. C at 65.) The arbitrator concluded that JAM had improperly utilized apprentices from ABC when the PSA called for it to use only apprentices from jointly managed programs. (*Id.* at 72–73.)

The Court denied without prejudice the Union's first motion for summary judgment, finding that the issue was not, as the parties presented it, whether the Seventeen were properly hired according to the procedures and exceptions laid out in the PSA and IWA. Rather, the Court concluded that the material issue was whether, of those employees hired, JAM made the appropriate benefit contributions. That determination hinged not on how the employees were hired, but on whether the employees were journeymen or apprentices. That issue has now been briefed and properly presented to the Court.

## II. LEGAL STANDARD

It is the burden of the party who moves for summary judgment to establish "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

---

**2.** The JATC is in accordance with the PSA. The PSA states that "[i]t is therefore the explicit understanding and intention of the parties ... to use the opportunities provided by the extensive amount of work to be covered by this Agreement to ... assist [residents] in entering the construction trades, and through utilization of **the joint labor/management sponsored apprenticeship programs,** provide training opportunities for those residents and

other individuals wishing to pursue a career in construction." (PSA § 1.2 (emphasis added).)

**3.** For instance, the parties to the IWA, were to "establish a foreman's training class, with curriculum to be developed by labor and management through the Electrical Training Institute of Southern California." (IWA § 4.20.)

R.Civ.P. 56(c). Once the moving party satisfies this initial burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e).

After the moving party meets its burden, a "genuine issue" of material fact exists only when the non-movant makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in favor of that party. *Id.* at 255, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. 2505.

## III. ANALYSIS

The sole issue raised by both parties' motions is whether the Seventeen were properly classified as apprentices as defined by the PSA. That question, in turn, depends on whether the PSA restricted the definition of "apprentice" only to those individuals enrolled in a "jointly managed apprenticeship program," which the Seventeen undisputedly were not. If so, then JAM underpaid their benefits. If not, then JAM paid the appropriate amount of benefits and the Union is entitled to no additional payments.

## A. Interpretation of the PSA and IWA

Parties generally can contractually limit the meaning of the term "apprentice" in a collective bargaining agreement. *See, e.g., Schembre v. AGR Constr. Co.*, Case No. CV 06–943, 2007 U.S. Dist. LEXIS 82817, at *8–9 (E.D.Mo. May 22, 2007) (finding that an employee was not an apprentice under the agreement at issue because the collective bargaining agreement required apprentices to be indentured to the defendants, and the employee was not); *Painters Dist. Council No. 30 Pension Fund v. Reece Servs.*, Case No. 87 C 2156, 1989 WL 152547, at *2 (N.D.Ill. Dec. 6, 1989) (finding that a group of employees were not apprentices under the collective bargaining agreements at issue because they were not enrolled in a program authorized by those agreements). The Union has persuasively demonstrated that the term "apprentice" in the PSA is restricted only to those employees enrolled in a "jointly managed apprenticeship program."

At various places, the PSA discusses apprenticeships, but does so only by reference to jointly managed apprenticeship programs, or "Labor/Management Apprenticeship Program[s]" (PSA at 13), not so-called unilaterally managed apprenticeship programs like the ABC, in which the Seventeen were enrolled. For example, section 3.3(a) states that "all ... hiring procedures, including related practices affecting apprenticeship, shall be operated so as to consider the goals of the District to encourage employment of District residents and utilization of small local businesses on the Project, and to facilitate the ability of all contractors to meet their employment needs." (PSA § 3.3(a).) One of the PSA's goals was to encourage District residents to enter construction trades through participation in joint labor/man-

agement sponsored apprenticeship programs. (PSA § 1.2.)

Further, Article 14 of the PSA explicitly contemplates enrollment in jointly managed apprenticeship programs as a precondition to apprentice status:

The parties recognize the need to maintain continuing support of the programs designed to develop adequate numbers of competent workers in the construction industry, the obligation to capitalize on the availability of the local work force in the area served by the District, and the opportunities to provide continuing work under the construction program funded by Proposition BB and Measure K. **To these ends, the parties will facilitate, encourage, and assist local residents to commence and progress in Labor/Management Apprenticeship and/or training Programs in the construction industry leading to participation in such apprenticeship programs.** The District, the Project Labor Coordinator, other District consultants, and the Council, will work cooperatively to identify, or establish and maintain, effective programs and procedures for persons interested in entering the construction industry and **which will help prepare them for the formal joint labor/management apprenticeship programs maintained by the signatory unions.**

(PSA § 14.1 (emphasis added).) The next section governing use of apprentices also sets the percentage of apprentices in the workforce, subject only to alteration by the standards of the "applicable joint apprenticeship committee." (PSA § 14.2(a).)

Finally, the PSA creates a subcommittee chaired jointly by representatives of each signatory to the PSA

to oversee the identification and/or effective development of procedures and programs leading to the full utilization of apprenticeship programs, and to work with representatives of each signatory craft's joint apprenticeship committee ("JAC") . . . to establish appropriate criteria for recognition by such JAC's of the educational and work experience possessed by District students and graduates toward qualifying for entry or advanced level in the apprenticeship program under the direction under such JAC's.

(PSA § 14.3.) The subcommittee's membership also includes at least three union members and three management members "experienced in overseeing and participating in joint labor management apprenticeship programs (or organizations to which the contractors belong)." (*Id.*) All of these provisions seem to contemplate that apprentices under the PSA will come only from jointly managed apprenticeship programs.

The terms of the IWA, incorporated into the PSA as a "Schedule A" (PSA § 2.7), lead to that same conclusion. For instance, Article V of the IWA specifically creates the "Joint Apprenticeship and Training Committee (JATC)," which is "responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.)." (IWA § 5.01.)[4] The IWA further provides that "[a]ll apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures." (IWA § 5.07.)

Moreover, consistent with sections 5.01 and 5.07 of the IWA that the JATC may create "local apprenticeship standards,"

**4.** The Court previously suggested that this provision may mean that other employee classifications exist beyond apprentices and jour-

neymen. Jam does not advance that argument here and the Court declines to address it.

the JATC created the "Local Apprenticeship and Training Standards," which define an apprentice as "[a] person who is covered by a written apprenticeship agreement with the JATC" (Davis Decl., Ex. A at 9), and "a person ... who has entered into a written Apprenticeship Agreement under the provisions of these standards" (*Id.*, Ex. A at 15). Thus, the language in both the PSA and the IWA suggests that the term "apprentice" refers only to those employees enrolled in a jointly managed apprenticeship programs and not to apprentices enrolled in unilaterally managed programs.

JAM claims that the PSA provisions discussed above do not place restrictions on who is an "apprentice" under the PSA, and incorporating the IWA's provisions into the PSA would contradict other PSA terms. For example, the PSA states that the parties will not discriminate based on union status (PSA § 3.4) and that "[n]o employee covered by this Agreement shall be required to join any union as a condition of being employed, or remaining employed, for the completion of Project Work" (PSA § 3.9). Since, according to JAM, apprentices must be union members to participate in jointly managed apprenticeship programs, reading that requirement into the PSA contradicts these other PSA terms.

Even if true, these allegedly contradictory provisions merely render the PSA terms ambiguous. In that case, the Court may resort to extrinsic evidence to determine the parties' intent when drafting the PSA, which reveals that the term "apprentice" was intended to cover only employees enrolled in jointly managed apprenticeship programs. "Written terms are ambiguous only if multiple reasonable interpretations exist," in light of the entire agreement's language, structure, and stated purpose. *Trustees of the S. Cal. IBEW–NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir.2008). The PSA does not define the term apprentice, and, as the above discussion demonstrates, both parties in this case have marshaled provisions in the PSA to support their divergent interpretations. Thus, resort to evidence of the parties' intent in drafting the PSA is appropriate. *See Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157–58 (9th Cir.2000); *Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir.1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution, in light of earlier negotiations, later conduct, related agreements, and industrywide custom." (citations omitted)).[5]

---

**5.** There appears to be a divergent line of cases suggesting that ambiguity in a collective bargaining agreement may not always be necessary to open the door to parol evidence. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580–81, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators."); *Pac. Nw. Bell Tele. Co. v. Commc'n Workers of Am.*, 310 F.2d 244, 247 (9th Cir.1962) (relying on *Warrior & Gulf* to affirm admission of parol evidence to interpret arbitration provision); *see also Syufy Enters. v. N. Cal. State Ass'n of IATSE Locals*, 631 F.2d 124, 126 & n. 1 (9th Cir.1980) (per curiam) (noting that ambiguity is not a prerequisite before admitting parol evidence); *cf. Cappa v. Wiseman*, 469 F.Supp. 437, 440 (N.D.Cal.1979) (considering parol evidence because collective bargaining agreement was "far from being an unambiguous instrument"), *aff'd and opinion adopted by* 659 F.2d 957, 960 (9th Cir.1981). Whether this authority conflicts with the more recent decisions in *Pace* and *Pierce County* is a question for another day because the meaning of "apprentice" under the PSA is ambiguous, satisfying either standard.

Richard Slawson, the Executive Secretary of the Council, which was a signatory to the PSA, testified that, under the PSA, "the term 'Apprentice' was intended to refer only to employees enrolled in 'jointly managed apprenticeship programs.'" (Slawson Decl. ¶ 6; *see also* Reed Decl. ¶ 6 (stating that, from his personal knowledge gained from the negotiations, "the negotiating parties intended for the PSA to recognize as 'Apprentices' only those employees enrolled in 'jointly managed apprenticeship programs,' not those enrolled in a 'unilaterally managed apprenticeship program.'") In fact, he testified that, while the State of California may recognize employees enrolled in unilateral programs as apprentices, the Council does not. (*Id.* ¶ 7.) He further explained that Council's interests lie only with using jointly managed apprenticeship programs for three reasons: (1) a program comprised of both labor and management representatives provides better training than a unilateral program; (2) the Council is associated only with construction craft unions with jointly managed plans, so limiting apprentices to those with membership in joint plans allows the Council to maintain minimum apprenticeship standards; and (3) in his experience, unilateral programs have a poor record of graduating apprentices and are not effective in producing experienced journeymen. (*Id.* ¶ 8.)

Slawson's experience negotiating the PSA with the LAUSD—and particularly the drafts he exchanged with LAUSD representatives—support his testimony. The LAUSD's initial draft of the PSA would have recognized as apprentices employees enrolled in "pre-apprenticeship and other apprenticeship and training programs." (Slawson Decl. ¶ 9, Ex. D § 3.3(b).) Slawson rejected that language because "it would have recognized as apprentices those employees enrolled in unilaterally managed apprenticeship programs," and he made interlineations on the document

to that effect. (Slawson Decl. ¶ 9, Ex. D at 76, 86, 111.)

Slawson sent back a new draft to the LAUSD, which specifically included language requiring the use of jointly managed apprenticeship programs only. (Slawson Decl. ¶ 10, Ex. E at 126, 137, 163–64.) The LAUSD resisted the limitation proposed by Slawson on behalf of the Council, most notably by attempting to remove any reference to joint programs from the definition of "Labor/Management Apprenticeship Program" so that the term included only "an apprenticeship program certified by the State of California." (Slawson Decl. ¶ 11, Ex. F. at 180; *see also* Ex. F at 191, 215–17.) Ultimately, the language was included in the final PSA. (Slawson Decl. ¶ 12, Ex. A at 13, '15, 24, 49–50.)

Likewise, the parties to the IWA testified that apprentices under that agreement were intended to include only those employees enrolled in jointly managed programs. Richard Reed, Assistant Business Manager for Local Union 11, a signatory to the IWA, and James Willson, a management representative on the JATC who negotiated the IWA, both agree that "to come within the definition of 'Apprentice' under the Wireman's Agreement, a person must sign an apprenticeship agreement with the JATC. Persons who have not signed apprenticeship agreements with the JATC are not considered 'Apprentices' under the Wireman's Agreement." (Reed Decl. ¶ 9; Willson Decl. 7.) Since that definition was incorporated into the PSA, it becomes clear that the term "apprentice" in the PSA was limited to employees enrolled in jointly managed programs.

Finally, consistent with the Court's analysis above, in the arbitration conducted under the PSA against JAM, the arbitrator found that the Seventeen were not apprentices under the agreement because they were not enrolled in jointly managed

apprenticeship programs. (Reed Decl. ¶¶ 12–13, Ex. C.)[6] The Arbitrator undertook a similar analysis as the Court does here and concluded that, under the PSA and the IWA, employees must be enrolled in jointly managed apprenticeship programs to qualify as apprentices under the PSA, and enrollment in a unilaterally managed apprenticeship program does not qualify. (*Id.* at 72–73.)[7]

JAM offers no evidence of intent contrary to that discussed above. Rather, JAM argues that it properly utilized the Seventeen as apprentices under the PSA and IWA, so, a fortiori, they must be apprentices under those agreements. (*See* Deushane Dec. ¶¶ 4–5 (explaining that the Seventeen were not assigned first to a jobsite, were always under the supervision of journeymen, and never supervised the work of others, all restrictions under section 5.13 of the IWA).) However, even if JAM properly used the Seventeen as apprentices under the IWA, that does not prove that they were properly classified as apprentices in the first instance. Rather, the proper interpretation of the PSA and IWA dictates that, even if the Seventeen worked as apprentices, they could not have been considered "apprentices" under the PSA.[8]

Thus, the Court concludes, based on undisputed evidence, that the PSA and IWA defined apprentices as only employees enrolled in jointly managed apprenticeship programs. The Seventeen were undisputedly not enrolled in those programs.[9]

6. Although JAM objects that the arbitration opinion is hearsay, the Court may admit it and give it weight it deems appropriate. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). It is also admissible under Federal Rule of Evidence 803(6) as a record of a regularly conducted activity. *See Graef v. Chem. Leaman Corp.,* 106 F.3d 112, 118 (5th Cir.1997). Moreover, JAM has the burden to demonstrate that the decision lacks trustworthiness, *see id.,* which it failed to carry with its unexplained hearsay objection (*see* JAM's Separate Statement No. 20). The Court has accorded the opinion some weight, though it does not find the opinion dispositive of the issue.

7. In passing, JAM claims that the Union should have brought a grievance like Local 11 did if it thought JAM was not making the proper contributions for the Seventeen. However, JAM has not demonstrated that the PSA provides a grievance procedure for trusts like the Plaintiffs in this case, and without evidence of an "intent to condition the contractual right of the trustees to seek arbitration procedures contained in the … collective bargaining agreements," the Court will not force the trusts to arbitrate their claims. *See Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 376, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984); *see also Carpenters Health & Welfare Trust Fund For Cal. v. Bla–*

*Delco Constr., Inc.,* 8 F.3d 1365, 1367–69 (9th Cir.1993).

8. JAM also argues that neither Local 11 nor any apprentice has challenged the apprentice classification. (Deushane Decl. ¶ 8.) JAM fails to cite authority or to explain how this fact is relevant to this case.

9. JAM presents evidence that Local 11 was unable to dispatch apprentices to JAM, so JAM had to secure apprentices from the ABC program. (Deushane Decl. ¶ 4; Mongillo Decl. ¶ 5; Nevarez Decl. ¶¶ 4–9.) The Union disputes that Local 11 was unable to dispatch apprentices. (Caldwell Decl. ¶ 3–4.) Nevertheless, this dispute is irrelevant. Although in some circumstances JAM might be able to assert Local 11's breach of the collective bargaining agreement as a contract defense, it cannot assert it against the Union seeking to collect amounts owed pursuant to a collective bargaining agreement. *See Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 467–70, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *see also Southern Cal. Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund,* 728 F.2d 1262, 1266 (9th Cir.1984) (holding that a contract defense is properly allowable against a trust in a contribution action only "when it relates to a promise to make contributions that is illegal.").

## B. Amount Owed

Pursuant to 29 U.S.C. § 1145, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." Under the PSA, if not properly classified as apprentices, employees must be considered journeymen and their benefits must be paid at journeymen rates. (Reed Decl. ¶ 10; Willson Decl. ¶ 8.)[10] Having concluded that the Seventeen were not classified as apprentices under the PSA, JAM breached the PSA and violated ERISA, so the Court must calculate the amount to which the Union is now entitled.

Pursuant to 29 U.S.C. § 1132(g)(2):

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2). The Trust Agreements also provide that an employer can be liable for the actual underpayment, interest, liquidated damages, audit fees, attorney's fees, and costs incurred in collecting delinquent contributions. (Union's Separate Statement No. 29.)

■ Once the Court issues judgment in the trusts' favor, award of these damages is mandatory, so long as: (1) the employer is delinquent at the time of the action; (2) the Court enters judgment against the employer; and (3) the plan provides for the award. *See Nw. Adm'rs, Inc. v. Albertson's, Inc.*, 104 F.3d 253, 257 (9th Cir. 1996); *see also Kemmis v. McGoldrick*, 706 F.2d 993, 997 (9th Cir.1983); *San Pedro Fishermen's Welfare Trust Fund Local 33 v. Di Bernardo*, 664 F.2d 1344, 1346 (9th Cir.1982). These conditions have been met here, so the Union is entitled to judgment in the amounts discussed below.[11]

■ The Court awards the Union $272,738.63 in underpaid contributions. (Cuadras Decl. ¶¶ 7–10, Ex. C.) Further, the Court awards interest of $55,940.34, as of October 5, 2009, the former date of the hearing in this matter.[12] (Cuadras Decl.

---

**10.** JAM has offered no evidence to refute this point.

**11.** JAM offers no evidence or argument to refute any of the Union's calculations, so the Court accepts them.

**12.** "[I]nterest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26," 26 U.S.C. § 6621. 29 U.S.C. § 1132(g)(2). Section 6621 states that "[t]he underpayment rate established under this section shall be the sum of—(A) the Federal short-term rate determined under subsection (b), plus (B) 3 percentage points." 26 U.S.C. § 6621(a)(2). The federal short-term rate is set by the IRS Revenue Ruling 2009–17 and compounded daily. Rev. Rul. 2009–17, 2009–26 I.R.B. 1111.

¶ 12, Ex. D.) The Court also awards interest accrued since October 5, 2009. Moreover, the Court awards liquidated damages under § 1132(g)(2) in the amount of accrued interest, i.e., $55,940.34, plus interest accrued since October 5, 2009. Finally, the Court awards auditor fees in the amount of $7,177.50 both as "such other and further relief" the Court deems appropriate under § 1132(g)(2)(E), and pursuant to the provisions of the Trust Agreements.[13]

## IV.  CONCLUSION

The Court concludes that the PSA limits the meaning of the term "apprentice" to employees enrolled in jointly managed apprenticeship programs, and the undisputed facts demonstrate that the Seventeen did not meet that definition. JAM admits that it paid benefits to the Union at the lower apprenticeship rate, so the Court finds it liable for underpayment of benefits. The Court GRANTS the Union's motion for summary judgment and DENIES JAM's motion for summary judgment.

The Court AWARDS the Union: $272,738.63 in unpaid contributions; $55,940.34 in interest accrued as of October 5, 2009, plus interest accrued since October 5, 2009; $55,940.34 plus interest accrued since October 5, 2009, as liquidated damages; and $7,177.50 in auditor fees.

**Within 10 days of the date of this Order,** the Union is ORDERED to lodge a proposed judgment conforming to the Court's Order.

**IT IS SO ORDERED.**

---

**13.** The Court declines to address attorney's fees and court costs since the Union indicates it may pursue them after judgment.